413 P.2d 774

R. C. DIEDRICH and Emily D. Diedrich, husband and wife, Appellants,

v.

J. A. FARNSWORTH and Jane Doe Farnsworth; husband and wife, and the Apache Land Development Company, a corporation, Appellees.*

No. 1 CA–CIV 290.

Court of Appeals of Arizona.

April 29, 1966.

Review Denied July 5, 1966.

*This appeal was filed with the Arizona Supreme Court and assigned that court's No. 7567. The matter was referred to this court pursuant to A.R.S. Section 12–120.23.

Stephen W. Connors, Phoenix, for appellants.

Johnson, Shelley, Roberts & Riggs, by J. LaMar Shelley, Mesa, for appellees.

MOLLOY, Judge.

This appeal is from a judgment rendered n. o. v. in favor of the defendant and appellee, Apache Land Development Company, after a jury verdict in favor of the plaintiffs-appellants, Diedrich, in a flood damage case in which the jury found the plaintiffs' damages to be in the sum of $10,000.00.

The only questions presented on appeal are (1) whether there was any material evidence to support the plaintiffs' contention that the defendant had interfered with the natural flow of water across certain lands of the defendant so as to cause rainwater to be diverted upon the plaintiffs' property to their damage and (2) whether there was any valid evidence to sustain a finding of damage in the sum of $10,000.00.

█ It is well-established law that in passing upon a motion for judgment notwithstanding the verdict, the trial court is constrained to view the evidence in a light most favorably to support the verdict of the jury. Tucson Title Insurance Company v. D'Ascoli, 94 Ariz. 230, 383 P.2d 119 (1963). But, if reasonable men could not under the undisputed evidence lawfully find for the plaintiff, the entry of judgment n. o. v. for the defendant is proper. Shafer v. Monte Mansfield Motors, 91 Ariz. 331, 372 P.2d 333 (1962).

The plaintiffs are the owners of approximately two and one-half acres of land, six and one-quarter miles east of Mesa, fronting on a main thoroughfare bearing the designation of US Highways 60, 70, 80 and 89, which highway will be referred to as Highway 80 in this opinion. In the area in question this highway runs due east and west. The plaintiffs' property is on the north side of this highway, fronts thereon for 165 feet and is 640 feet in depth. On the southern or front one-half of the property there was at the time of the flood damage in question, September 12, 1958, a partially constructed thirteen unit motel. There were five units completed together with a six-room home of the plaintiffs on the property, with other units under construction. On the rear, or north, end of plaintiffs' property was an old shed. To the north of plaintiffs' property lies thirty-five acres belonging to the defendant. Approximately 660 feet to the west of plaintiffs' property is a public highway known as Higley Road, which intersects the US Highways 60–70–80–89 in a perpendicular fashion. Higley Road is the western boundary of defendant's property. The physical layout of the respective properties is illustrated by the following sketch.

Imposed upon the layout of the property ownership is a rough sketch of the natural drainage pattern affecting the area in question as described by three civil engineers who testified during the trial and as shown by aerial photographs in evidence. Also superimposed through the area of the defendant's land are two dashed lines, labeled "undefined lines on aerial photograph," which represent lines of darkness on aerial photographs in evidence. The nature of these particular lines was never explained by any of the expert witnesses who testified.

The plaintiffs acquired their property in 1950 and sometime thereafter began building a motel thereon. The defendant acquired its land in 1957 and sometime during the summer of 1958 began to develop the property as a housing subdivision. Sometime before September 12, 1958 the easternmost portion of the defendant's property had been graded and the natural drainage channels through the property had been altered to some extent by the defendant and it is for this work that plaintiffs claim damage in this action. Along the eastern boundary of the defendant's property defendant had constructed a ditch running north and south to the southeast corner of the property and then extending west along the southern boundary to a point somewhere in the vicinity of the "ponding area" shown in the sketch. At the point where the main wash came upon defendant's land in about the center of its eastern boundary, defendant had constructed a north-south retaining wall to turn the flow to the south into the ditch constructed. Additionally, there was a ditch bladed along the northern boundary of defendant's property the entire length thereof, to Higley Road, a distance of approximately 2300 feet. The location of the diverting ditch along the southeast boundary of defendant's property, as shown on the sketch included above in this opinion, is as depicted on Exhibit 40, an exhibit prepared by a civil engineer employed by plaintiffs and who testified in their behalf.

Taken at the largest established by the evidence, the ditch built by the defendant on the eastern and southern boundaries of its property was eight feet wide and two and one-half deep, with vertical sides. The testimony as to how far this ditch extended to the west toward the plaintiffs' property may be critical to the outcome of this appeal and will therefore be stated in detail.

F. D. Sax, a civil engineer employed by the defendant to make a drainage study immediately after the flood in question and who completed his work in November of 1958, indicated that the constructed ditch ended approximately 675 feet east of the eastern boundary of plaintiffs' property at a point where the southern boundary of defendant's property intercepted the main natural wash. In exhibits prepared by the plaintiffs' civil engineer, Carl E. Ludlow (and as shown in the sketch supra), the terminating point of this east-west ditch is 250 feet east of the eastern boundary of plaintiffs' property, in approximately the center of the area where the civil engineers agreed there was a tendency for the water to spread out and "pond" during times that the washes were in flood stage. Mr. Ludlow testified that his determination of the location of this ditch at the time of the flood was not based upon a study of the ground but upon information given to him by the plaintiff, Mr. Diedrich, and upon the work of Mr. Sax.

Mr. Sax's survey revealed that in addition to the ditch previously described he had found a blade cut in the surface of the natural ground, about 300 feet long, running along the southern boundary of the defendant's property further to the west than the above described ditch, which blade cut ended approximately at the northeast corner of the plaintiffs' land. The depth of this blade cut was approximately eight inches below the natural ground. According to Mr. Sax, this blade cut was in the "ponding area" of water when the washes were running full, and effectively went from " * * * nowhere to nowhere * * *" in that it would have no appreci-

able affect upon the natural flow of water through this area in time of heavy rain.

Mr. Diedrich testified that the plaintiffs' ditch ended right at the northeast corner of his property. However, he identified one photograph admitted in evidence as being a true representation of the ditch in question taken a few days after the flood (Exhibit 11). According to Mr. Diedrich, Exhibit 11 was taken at the intersection of the Gomez and Perry properties on their northern boundary, looking east. The ditch represented in the foreground of this snapshot corresponds to the bladed ditch described by Mr. Sax. The photograph shows a ditch in the distant background which appears to be the vertical-sided ditch found by Mr. Sax further to the east.

Mr. Donald Mazurek, stepson of Mr. Diedrich, identified another exhibit (Exhibit 42) as a snapshot taken from the northern end of plaintiffs' property looking east on the "ditch" constructed by the defendant. The snapshot in question portrays a shallow tapered ditch that would correspond to the 300 foot long "blade cut" described by Mr. Sax. In addition, the stepson identified another such snapshot (Exhibit 43) as being a portrayal of the ditch close to the plaintiffs' property "* * * after they [the defendant] reopened it to normal." This rebladed ditch again corresponds with the bladed ditch described by Mr. Sax.

Mr. Davis, the proprietor of a restaurant located on the Gomez property, testified that the defendant's ditch ended in approximately the middle of the Gomez property. Mr. Davis, a plaintiffs' witness, stated that there was no natural wash where the ditch was dug and that the water coming from the ditch dug by the defendant came from the south of the old channel. Elaine Mazurek, stepdaughter of Mr. Diedrich, testified that the ditch ended at the north end of the Diedrich property. Mrs. Gomez denied that there was any ditch built along the northern boundary of her property prior to the flood in question. The defendant had a number of witnesses who testified that there was no ditch constructed to the west of the dedicated road forming the east boundary of the Leason property prior to the flood in question. All of this apparent inconsistency in testimony reconciles substantially with the drainage study made by Mr. Sax, if one accepts the possibilities that the "blade cut" described by Mr. Sax might be a "ditch" to some and not to others, and that the "ponding area" might not appear to be a natural drainage channel in time of dry weather.

Along the northern boundary of Highway 80 there was a ditch carrying flood waters to the culvert under the highway just to the west of the plaintiffs' property. The culvert under the highway was established variously (1) as being made of two "tiles," each 36 inches by 40 inches in size (testimony of Mr. Diedrich), (2) as consisting of two "boxes," each 2 feet by 5 feet or about " * * * 30 square foot of area * * *" (by James R. Brown, civil engineer), and (3) as a 3 feet by 12 feet concrete box (so shown on chart of drainage study prepared by Mr. Sax).

This culvert was the only method provided for taking the drainage from the general area in question underneath the two highways (Highway 80 and Higley Road) forming the south and west boundaries of this area. All witnesses, including the plaintiff Diedrich, agreed that the drainage pattern in this area was to the southwest.

Highway 80 in the area in question was built up six to eight inches higher than the top of a retaining wall running north and south along the eastern boundary of plaintiffs' property in front of the motel buildings. This retaining wall was variously described as being one, two, two and one-half and four feet in height. Mr. Diedrich testified that this retaining wall had been built when he first purchased this property in 1950 because water was seen coming across the front of their property during heavy rains. Subsequently, the plaintiffs built the east wall of their motel on the east line of their property, connecting it to

the retaining wall, so that there was a continuous line of wall from the front of their property back a distance of approximately 325 feet. On the day in question, this wall line caused waters to back up onto the Gomez property, so that water on the Gomez property was approximately two feet deep all over the lot, with the water coming up to the mattresses in the Gomez home.

A description of the natural drainage pattern in this area, as given above, is complicated by the testimony of Mr. Diedrich, to the effect that the main washes through the area in question were two channels running almost due east and west through defendant's land, commencing at the eastern boundary of the defendant's thirty-five acres and ending on Higley Road. The location of these two washes would correspond generally with the two dashed lines on the sketch included in this opinion labeled "undefined lines on aerial photograph." Upon examining these lines on an aerial photograph (Exhibit 53), taken before any interference with the natural drainage channels, it is apparent that this line of vegetation, if it be vegetation, can be followed for several miles to the east and is cut across by many drainage lines running in a southwesterly direction.

The testimony of Mr. Diedrich as to these two east-west washes is directly contrary to testimony given by him at a prior trial of this same action which ended in a mistrial because the jury could not agree. Portions of this testimony given at the prior trial were read into the record in this case and two exhibits which were sketches of the area in question prepared by Mr. Diedrich were admitted in evidence in this trial (Exhibits 37 and 38). These sketches show the natural drainage in the area in question to be substantially the same as described by the three civil engineers who testified in this action. The witness gave no explanation as to why his testimony as to the location of the main washes had not been the same during the prior trial.

On the day in question, September 12, 1958, there were very heavy rains in the area in question and on the higher ground to the northeast. In addition to rising two feet high on the Gomez property, the water covered the plaintiffs' property from approximately six inches deep in the back of the property to between eighteen and twenty-four inches in the front. The water rose in the motel units between eight to twelve inches and did considerable damage to the floors and walls thereof. Water flooded out cesspools on the plaintiffs' property, a swimming pool, and damaged personal property of various types.

The flow of water in the area in question lasted for a number of hours. Mrs. Gomez testified that she first saw a big current of water coming off the Leason property onto her property at " * * * about noon * * *" on the day in question. A highway employee testified that " * * * late in the afternoon" of the day, sometime after 3 p. m. when he received a call to go to the area in question, the flood waters were running over Higley Road at its intersection with Highway 80 and were flowing down Highway 80 across the bridge and into the canal, with the water being eight inches deep on the main highway.

Mr. Diedrich testified that the water overflowed Higley Road for a period of an hour or more, ("It might have been an hour, two hours, three hours.") and that the culvert under the highway near his property was inadequate to carry off the water flowing into the area. Mr. Diedrich further testified that there was no obstruction to keep any water on his land from flowing onto the trailer court property to the west. Mr. Sax testified that when water would be flowing over Higley Road at the intersection with Highway 80 at a depth of two to six inches, water would be approximately a foot and a half deep on the plaintiffs' property. The front portion of the trailer court property to the east of plaintiffs' property was covered approximately as deep as the plaintiffs' property all the way to the intersection of Higley Road. In addition, the rear of the Leason property was covered

with flowing water up to a retaining wall built by Mr. Leason to protect his home on the rear of his property. The ditch along the north side of the highway was running full.

Mr. Davis testified that the mainstream of water came from the Leason property onto the rear end of the Gomez property and came onto the Diedrich property on " * * * the full length of it, * * *" and that the water was coming " * * * on an angle south by west and it hit that wall * * *." Mr. Diedrich testified that prior to the '58 flood, he had never had any water across his property since he had purchased it in 1950. This testimony is contrary to the testimony of several disinterested witnesses, who testified that flood waters had come onto the plaintiffs' property in prior years in the front portion of this property, and is also contrary to this same witness's statement as to why the retaining wall was built along the eastern boundary of his land in the first place.

Mr. Diedrich testified that the water entered his property from the back, from the east side, and from the front. Though Mr. Diedrich stated that most of the water came from the back end, he also testified that the water made a "rut way" under a motel unit being built on his east property line, and that the water flowed under this building and into the swimming pool constructed immediately to the west thereof. He stated that the water flowed over the retaining wall in the front of his property. Further, he testified that there was no flood damage to the tin shacks on the back of his property.

Elaine Mazurek, the stepdaughter, testified that all of the water that got onto the property came from the defendant's ditch. However, this witness also testified that she was not at home on the day in question and did not return until that evening when all the damage was done. At other points in her testimony, Miss Mazurek confirmed that the east wall along the plaintiffs' property line was broken in by the water, presumably where it undermined one of the

motel units, and that if it had not been for the retaining wall along the east boundary, the water " * * * would have come right straight through * * *" the property. Mrs. Gomez testified to observing the sudden break in plaintiffs' east wall causing the water to pour into plaintiffs' property.

Both civil engineers testifying for the defendant were of the opinion that the work performed by the defendant prior to the flood in question could have had no detrimental effect upon the amount of waters deposited upon the plaintiffs' property. However, the civil engineer (Ludlow) called by the plaintiffs testified that the construction of the ditch along the east and southern boundary of the defendant's property had the effect of increasing the amount of water delivered and deposited onto the Diedrich property in two ways. According to this witness, (1) the grading of the defendant's land would increase the runoff of rain falling upon the property, and (2) the channeling of the water by a ditch would decrease the amount of water which would be absorbed into the soil. This witness gave no estimate of the quantity of any increase, either in terms of percentages or in any other type of measurement. At one time in cross-examination, he testified that the grading operations upon the land would not " * * * appreciably affect * * *" the total amount of water running off the property in question to the property below.

James R. Brown, a civil engineer employed by the defendant, testified that the ditch built across the north boundary of the defendant's property, if it had any effect upon the amount of water coming upon plaintiffs' land, could only lessen the amount. There was no contrary evidence. There was unrefuted testimony from defendant's witnesses that the ditches constructed by the defendant around the southeast perimeter of its property were broken through and the original channels temporarily reestablished in the southeast portion of this acreage, during the flood in

question, which natural channels were subsequently covered over again by the defendant after the flood.

Appellee defends the decision of the trial court in setting aside the jury verdict on several bases, one of which is on the theory that the waters involved in this case are "surface waters" and that under the decision of City of Tucson v. Dunseath, 15 Ariz. 355, 139 P. 177 (1914), the so-called "common enemy" rule applies.

In City of Tucson v. Dunseath, the court held, without explanation, that waters passing down a "swale or depression" passing over certain lots in the City of Tucson were "surface waters" and adopted what the court labeled the "common-law rule" [1] as to such waters. The court quoted with approval from Walker v. New Mexico & S. P. R. Co., 165 U.S. 593, 17 S.Ct. 421, 41 L.Ed. 837 (1897), as follows:

"'One is under no obligation to receive from the other the flow of any surface water, but may, in the ordinary prosecution of his business and in the improvement of his premises, by embankments or otherwise, prevent any portion of surface water coming from such upper premises.' Walker v. New Mex. S. P. R. Co., 165 U.S. 593, 17 Sup. Ct. 421, 41 L.Ed. 837." 15 Ariz. 355, 359, 139 P. 177, 178 (1914).

Walker v. New Mexico held that waters flowing down arroyos as the result of a cloudburst in nearby mountains was "simply surface water" (17 S.Ct. at 423). The court stated in this connection:

"And the arroyos through which the water flowed after leaving the mountains were not running streams,—natural water courses,—but simply passageways for the rain which fell." 17 S.Ct. at 423.

The holding of Walker was expressly disapproved by the New Mexico Supreme Court. Martinez v. Cook, 56 N.M. 343,

244 P.2d 134, 138 (1952). The court said, in part:

"New Mexico is a state with an enormous number of arroyos which serve the purpose of drainage ways during the rainy seasons but are dry at other times. The rule in eastern states that to constitute a watercourse water must be carried in the channel throughout the entire year or a majority of the time is not suited to our conditions. Likewise, the holding in the Walker case that because a deep arroyo terminated in the flat country although the water thereafter traveled to a river through defined channels, that dams may be thrown across such channels and the water cast back on higher lands is ill suited to conditions in this state and the case will not longer be followed." 56 N.M. 343, 244 P.2d 134, 138 (1952).

In a number of cases decided in this jurisdiction, waters flowing in washes or arroyos have been assumed to be "surface waters," without any clear explanation of why this must be the case. Among such decisions are: Kroeger v. Twin Buttes R. R. Co., 14 Ariz. 269, 127 P. 735 (1912); Gibson v. Duncan, 17 Ariz. 329, 152 P. 856 (1915); Roosevelt Irrigation District v. Beardsley Land & Investment Co., 36 Ariz. 65, 282 P. 937 (1929); Maricopa County Water C. Dist. No. One v. Roosevelt Irrigation Dist., 39 Ariz. 357, 6 P.2d 898 (1932); and Southern Pacific Company v. Proebstel, 61 Ariz. 412, 150 P.2d 81 (1944).

Other decisions of our Supreme Court have assumed that waters flowing in arroyos or washes are stream waters or, at least, that the law pertaining to stream waters was applicable: City of Globe v. Shute, 22 Ariz. 280, 196 P. 1024 (1921); City of Tucson v. O'Rielly Motor Co., 64 Ariz. 240, 168 P.2d 245 (1946); Maricopa County Municipal Water C. D. No. 1 v. Warford, 69 Ariz. 1, 206 P.2d 1168 (1949); Schlecht v. Schiel, 76 Ariz. 214, 262 P.2d

---

1. To the effect that the "common enemy" rule as to surface waters may not be the common-law, see 3 Farnham, Waters and Water Rights, § 889b, pp. 2587 et seq.

252 (1953); City of Tucson v. Koerber, 82 Ariz. 347, 313 P.2d 411 (1957); and Gillespie Land & Irrigation Company v. Gonzalez, 93 Ariz. 152, 379 P.2d 135 (1963). A federal case arising in this jurisdiction takes the same view: Southern Pacific Company v. Smith, 83 F.2d 451 (9th Cir. 1936).

In City of Globe v. Shute, supra, our Supreme Court said:

"We find no difficulty in holding that a ravine or wash is a 'natural stream' or 'water course,' in the sense of the law, where the rains or snows falling on the adjacent hills run down the ravine or wash in a well-defined channel at irregular intervals." 22 Ariz. 280, 289, 196 P. 1024, 1027 (1921).

■ Perhaps this apparent inconsistency in treatment can be reconciled when the areas drained by the respective washes are compared. The extent of the watershed draining into the washes now considered by this court was not established in the evidence, but in examining the aerial photograph, which is Exhibit 53 in evidence, it is apparent that the main wash in the area runs at least three miles to the northeast, off the photograph, and drains an area which includes at least four square miles. We do not believe that any diminutiveness in the size of the area drained as demonstrated by this evidence can prevent this wash from falling into the classification of a natural watercourse.

■ This court is impressed with the reasoning of the New Mexico Supreme Court in Martinez v. Cook, supra, and believes that the state of the authority in this jurisdiction permits us to follow this decision. We are therefore of the opinion that the waters flowing in the washes in question which are containable within their natural banks fall into the category of "stream waters," and that therefore the case cannot be disposed of on the theory of the "common enemy" rule of City of Tucson v. Dunseath.

■ In addition to "stream waters," we are also obviously concerned in this case with waters which may be characterized as "flood waters," in that on the day in question the evidence is undisputed that the waters flowing through the area in question were beyond the natural capacities of whatever washes existed to drain the area in question. We believe the law pertinent to this case therefore to be stated in Gillespie Land & Irrigation Company v. Gonzalez, 93 Ariz. 152, 165, 379 P.2d 135, 145 (1963), as follows:

"A landowner may not divert the natural waters of a stream in such a manner that these waters, combined with flood waters, cause damage to his neighbor, * * *." 93 Ariz. at 165, 379 P.2d at 145.

We thus arrive at the question as to whether there is any substantial evidence that the defendant "diverted" the course of a natural stream, as recognized by the rule of law quoted above, so as to damage plaintiffs' property and, if so, whether there is sufficient evidence as to the extent of such damage so as to present a question of fact for a jury.

If the testimony given by the plaintiff Diedrich at this trial that the main washes in this area ran east and west through the defendant's property to Higley Road is accepted as having any substance, we must consider two completely inconsistent drainage patterns in applying law to the facts.

In Cope v. Southern Pacific Company, 66 Ariz. 197, 204, 185 P.2d 772, 777 (1947), our Supreme Court adopted the rule of Steele v. Kansas City Southern Ry. Co., 265 Mo. 97, 175 S.W. 177, 181 (1915), as follows:

"'* * * We are not bound, even as an appellate court, to believe a mere witness in a case when it appears from conclusive physical facts or otherwise patently that such witness is either perjured or clearly mistaken. * * *'" 66 Ariz. 197, 204, 185 P.2d 772, 777 (1947).

In this case, we have the testimony of three qualified civil engineers, one of whom was the plaintiffs' witness, to the effect that the natural drainage ran southwest across the southern portion of plaintiffs' property. We have aerial photographs before us which in our view show the natural drainage to be in accordance with this expert testimony and other than that testified to by the witness Diedrich. The testimony of this witness at this trial is diametrically opposed to his testimony at a prior trial of this action. There is no explanation given for this disparity in sworn testimony. The east-west wash testimony is not consistent with the testimony of this same witness at this trial that the drainage in this area is to the southwest. Under these circumstances we hold that the trial court was justified in disregarding the testimony of Mr. Diedrich as to the east-west washes.

We are thus brought to an appraisal of a diversion by the defendant of drainage channels which in natural state pass over the plaintiffs' property below the point of interference by the defendant.

There are three suggestions made in the evidence as to how the work performed by the defendant might have affected the volume of water cast upon the plaintiffs' motel. Two of these theories were advanced by the civil engineer employed by the plaintiffs. According to this witness, the water coming upon the plaintiffs' property would have been increased, in some unspecified amount, by the fact that the ditches built would accelerate the water flowing through or by the defendant's property so that less of it would soak into the ground. This witness's other theory was that there would be some increase in the flow by reason of the leveling operations performed upon the defendant's property.

As to both of these theories there is well-established general law to the effect that any damage so caused would be damnum absque injuria. This law finds expression in 56 Am.Jur., Waters § 73, p. 559, as follows:

"It is well established as a general rule, subject to certain modifications hereinafter noted, that the owner of lands through or along the border of which a natural watercourse flows may accumulate surface water falling upon lands adjacent thereto, and cast the same into such stream, without liability to a lower riparian owner for damages, although the flow of the waters is thereby accelerated and the volume increased, provided that this is done in the reasonable use of his own land."

Also see 93 C.J.S. Waters § 117, p. 816, and Archer v. City of Los Angeles, 19 Cal.2d 19, 119 P.2d 1 (1941).

A corollary of the above quoted law pertains to the right to divert a natural watercourse so long as the water is returned to the natural channel before it arrives at the claimant's property. This law is stated as follows:

"There can be no doubt as to the right of a landowner to divert or change the course of a stream flowing through his land, provided he returns it to its original or natural channel before it reaches the land of the lower owner. It has been held that the right to change the course of superabundant water produced by freshets is not less clear than the right to change the course of the ordinary stream." 56 Am.Jur., Waters § 14, p. 504 (1947).

Also see 93 C.J.S. Waters § 130a, p. 846.

While we have had no decisions in this jurisdiction called to our attention directly supporting the general encyclopedic statements of law quoted above, we find nothing in decisions of our Supreme Court to cause us to depart from this general law,[2] and adopt it as the law of this case.

2. We note that in Gillespie Land & Irrigation Company v. Gonzalez, 93 Ariz. 152, 379 P.2d 135 (1963), the court was also concerned with a "pooling" (93 Ariz. at 165, 379 P.2d 135) of stream waters, but the case we believe is critically dis-

There is no suggestion in this record that the clearing of defendant's land for subdivision purposes was not a reasonable use thereof or that the work performed by the defendant was done in a negligent manner. Hence, we believe the above quoted law absolves the defendant from liability insofar as its grading work is concerned and insofar as defendant diverted a natural watercourse around its land and returned the water to the natural channel above plaintiffs' property. There remains the question of whether there was any credible evidence that plaintiffs suffered any substantial damage from a diversion of a natural watercourse which was not returned to its natural channel before reaching plaintiffs' property.

While the plaintiffs produced testimony that defendant's "ditch" came as far west as the corner of plaintiffs' property, this testimony, when taken in connection with the photographs authenticated by plaintiffs, establishes that only the blade cut came this far. The testimony of civil engineer Sax that this relatively shallow ditch could have had no appreciable effect upon the volume of water coming upon plaintiffs' land stands unrefuted.

Additionally, under any of three versions of the evidence, the culvert under Highway 80 was larger than any ditch attributed to the defendant's doing. It is very clear that this culvert was not of sufficient volume to carry off the water coming down the washes in question, thus resulting in the water overflowing Higley Road at Highway 80. There is no evidence contrary to the testimony of Mr. Sax that when such was the case plaintiffs' property would necessarily be inundated substantially to the extent that it was. The testimony of all witnesses, including that of the plaintiff Diedrich, as to the total volume of water flowing into the area in question lends support rather than discredit to the drainage study of Mr. Sax.

Accordingly, we agree with the trial court that reasonable men should not be able to come to the conclusion that any change in the place of flow of this natural watercourse resulting from defendant's activities substantially increased plaintiffs' flood damage. We hold that the trial court rightfully ordered judgment for the defendant notwithstanding a jury verdict for the plaintiff.

The view taken of this appeal precludes the necessity of considering the assignment of error pertaining to admitting in evidence the plaintiffs' estimates of the total damage incurred in the flood in question.

Judgment affirmed.

KRUCKER, C. J., and HATHAWAY, J., concur.

NOTE: This decision has been rendered by the Judges of Division Two as authorized by A.R.S. Section 12–120, subsec. E.

similar for the reason that the pooling effect in Gonzalez had been artificially created by the defendant, while in this case the pooling effect involved in the drainage pattern is one naturally created by the confluence of two natural washes.