483 P.2d 790

M. B. KIRKPATRICK and Mildred Kirkpatrick, his wife, and Alaska General Credit Corporation, a corporation, Appellants,

v.

Ruth BUTLER and Edmond K. Butler, her husband, Appellees.

No. I CA–CIV 1318.

Court of Appeals of Arizona, Division 1, Department B.

April 15, 1971.

Rehearing Denied May 20, 1971.

Review Denied June 22, 1971.

**378**

Snell & Wilmer, by Mark Wilmer, Phoenix, for appellants.

Powers, Boutell & Fannin, by James Powers, Phoenix, for appellees.

JACOBSON, Presiding Judge.

Whether plaintiffs, landowners on the edge of the Hassayampa River, presented sufficient evidence to go to the jury on the wrongful diversion of flood and surface waters by an upstream landowner, is the primary question in this appeal.

Plaintiffs-appellees, Ruth Butler and Edmond K. Butler, her husband, brought an action in the Superior Court of Maricopa County against defendants-appellants, M. B. Kirkpatrick and Mildred Kirkpatrick, his wife and Alaska General Credit Corporation, alleging that defendants wrongfully diverted surface waters into artificial channels, interfered with natural channels, and raised the elevation of their land so as to cast floodwaters and surface waters onto plaintiffs' property, causing damages. The matter was tried to a jury which returned a verdict in favor of the plaintiffs in the sum of $50,000.00. Defendants appealed from the judgment entered on that verdict together with the denial of their post-trial motions.

The Hassayampa River flows generally in a southerly direction as it passes the town of Wickenburg, Arizona. As is true of a number of rivers in Arizona, the term "flow" is misleading if used in the sense that the river continually contains running waters. This river only "flows" in that sense following rains and is usually dry. Immediately north of the Phoenix-Wickenburg highway bridge that crosses the Hassayampa River and on the west side of the Hassayampa River, is the bench of land which was formed between the secondary flow channel of the river and the primary, low flow channel. This bench of land, consisting of several hundred acres, is elevated several feet above the primary low flow channel of the river, but is approximately three to four feet lower than the land immediately to the west. This three to four-foot rise on the west represents the actual western bank of the Hassayampa River. For at least 30 years prior to 1965, this bench of land had not felt the natural flow of the waters of the Hassayampa during flood season or otherwise.

In 1959, plaintiffs purchased a parcel of this bench land, built a home thereon and planted a pecan orchard. Immediately to the north and adjoining plaintiffs' property was a rectangular-shaped parcel of land approximately 14 acres in size which had been leveled and farmed by irrigation since at least 1950. The 14-acre rectangular parcel had its long side generally parallel to the river (running in a north-south direction) and the west boundary of this parcel was generally contiguous with the three to four foot rise of the western bank of the Hassayampa. For irrigation purposes this 14-acre parcel was divided approximately in half. The north half

of the parcel was watered by a pipeline on the eastern edge of the field and the water flowed west across the field towards the actual western bank of the bench land. The southern half of the parcel was watered by a pipeline which ran across the center of the parcel—the water flowing, by the use of furrows, in a southerly direction towards plaintiffs' property.

Prior to 1963, the elevation of this land could generally be likened to a large rectangular-shaped board that was tilted in such a manner that its northern edge was approximately six feet higher than its southern edge and its eastern edge was approximately one to three feet higher than its western edge. At this time a dirt road lay along the northern half of the western edge of the property and below the three to four-foot bank. Also at this time a crude, dirt air strip lay along the eastern edge of the irrigated field for approximately its entire length. ·

This land was in this condition when purchased by the defendants who immediately undertook to make improvements on the property to better utilize the irrigated portion and to place the property in condition to raise and breed blooded horses. To this end, defendants contacted the United States Soil Conservation Service which made a survey of the entire irrigated parcel with recommendations as to levelling. There is thus preserved a survey map showing elevations on this property prior to the improvement and subsequent thereto. The improvements contemplated by the defendants envisioned the levelling of the fourteen acre parcel in such a manner that the property was divided for irrigation purposes into nine plateaus, each plateau being generally level in an east-west direction and slightly lower than the plateau immediately to the north of it. These plateaus are irrigated by a cement pipe running down the middle of the irrigated field with the water then flowing from the center to the edges of the field. Carrying the rectangular board illustration a step further, if one were able to look along the top of this board in a northerly direction after the irrigation improvements were completed, the northern edge of the board would still be six feet higher than the southern edge, but the east-west tilt would be nearly eliminated and in place thereof would be a series of approximately nine, seven-inch-high steps, progressing from the southern edge northward.

In addition to the irrigation improvements, several buildings were placed on the property, the dirt road at the western edge was paved and the dirt runway was paved and extended, through the acquisition of easements, in a northerly direction for approximately 1,000 feet. The runway was constructed in such a manner as to be crowned thereby facilitating water runoff and for this purpose was raised approximately six inches in the middle above the existing surface. Defendants, in the southwest portion of the property, also removed a portion of the three to four foot bank (110 cubic yards of dirt) redistributed this dirt on other portions of the property and built stables and other buildings in this area.

On September 5, 1965, when these improvements were substantially completed and following rather heavy rains in August and early September, a large flood developed which inundated both plaintiffs' and defendants' property, rising to a level of four to four and one-half feet above the existing surface at the northwest corner of plaintiffs' property (southwest corner of defendants' property).

Water entered plaintiffs' property at this northwest corner and at the southern end of the airstrip. Subsequent flooding occurred approximately three or four days later, in December, 1965, and again in December, 1967.

Following the December, 1965, flood, defendants, together with their neighbors, (but not the plaintiffs) placed dikes on the northern end of the airstrip and thereafter it appeared that flooding occurred only at the western edge of plaintiffs' property. Evidence was introduced to show that the pecan trees previously planted by plaintiffs

were rendered unuseable for commercial purposes as a result of the water entering upon plaintiffs' property, and that plaintiffs suffered other damage to personal property located on their property.

There does not appear to be any dispute as to the correctness of the principles of law upon which plaintiffs rely to impose liability upon the defendants. These may be summarized as follows:

 One may divert waters flowing in a natural channel upon the lands of his neighbor who is under no duty to receive them, Schlecht v. Schiel, 6 Ariz. 214, 262 P.2d 252 (1953); and a landowner has no right to collect surface waters in artificial channels and discharge it in large quantities onto the land of an adjoining owner to his damage, Maricopa County Municipal Water Conservation Dist. No. 1 v. Warford, 69 Ariz. 1, 206 P.2d 1168 (1949).

Under these principles, plaintiffs' factual theory as to defendants' liability was three-fold.

 First, plaintiffs contend that prior to defendants' improvements, water which collected in washes to the west of defendants' property came onto defendants' property, flowed along the western edge thereof in a southerly direction until it hit a bluff and was then diverted into a natural channel about the center of defendants' property which then crossed defendants' property to the river—thereby bypassing plaintiffs' property. Plaintiffs contend that after defendants' improvements were made, this bluff was removed and the natural water course obliterated thus allowing the waters to continue in a southerly course onto plaintiffs' property. Basic to this theory of liability is the existence, prior to defendants' improvements, of a natural water course across the defendants' property which defendants subsequently obstructed. A "natural water course" has been defined as having a source and terminus, banks and channel, through which waters flow at least periodically. Southern Pacific Co. v. Proebstel, 61 Ariz. 412, 150 P.2d 81 (1944). While

one or two witnesses' testimony might, under the appellate theory that all evidence and all the inferences to be drawn therefrom must be taken in a light most favorable to support the jury's verdict, indicate the existence of a wash across defendants' property at some point in time prior to defendants' improvements, the physical evidence is that immediately prior to defendants' improvements no such wash could have existed. This is for the reason that for such a natural channel to exist, it would necessarily have had to flow across defendants' property from the west to the east. Since 1950, the defendants' predecessor in interest farmed and irrigated this property in such a manner that the northern half of the parcel was irrigated by water flowing from east to west. The southern half of the property was irrigated in such a manner that water flowed from north to south and these north-south irrigation furrows would have had to cut across any channel in existence. Thus, such a channel could only have existed where the north field joined the south field and undisputed surveys showing the condition of the ground immediately prior to defendants' improvements show that at this point the eastern edge of this property was three feet higher than the western edge. In other words, in order for a channel to have existed at this point, water would have had to flow uphill. Where the undisputed physical evidence is such that to believe the oral testimony, one is required to disregard a natural law of physics, the oral testimony is not sufficient to give rise to a jury question. Cf. Parton v. Phillips Petroleum Co., 231 Mo.App. 585, 107 S.W.2d 167 (1937). We therefore hold there was insufficient evidence before the jury to sustain a verdict based upon plaintiffs' first theory of liability.

Plaintiffs' second theory of liability was that paving the road on the west of defendants' property together with placing an irrigation pipe down the center of defendants' property in essence formed an artificial channel by which surface and stream waters were discharged in large quantities.

onto plaintiffs' property. Likewise, it was contended that the paved runway on the east edge of the property had the effect of collecting stream and surface water and conducting it to plaintiffs' property.

First, plaintiffs produced absolutely no evidence of "surface waters" causing damage to their property. "Surface waters" are those waters coming onto the ground and naturally spreading over the ground before they have formed into natural water courses. Southern Pacific Co. v. Proebstel, *supra*. Plaintiffs' entire evidence dealt either with water which had formed itself into washes and streams west of plaintiffs' property and then proceeded within well-defined boundaries onto defendants' property and thence to plaintiffs' property, or, with water which had escaped from the primary channel of the Hassayampa River and flowed over defendants' land to plaintiffs' land. As to the water which escaped from the Hassayampa River, this is not "surface water," but floodwater which does not lose its character as such while flowing wildly over the land. Southern Pacific Co. v. Proebstel, *supra*.

Secondly, there was no evidence whatsoever that a "stream" once cut across the present location of the runway, which has since the raising of the runway been diverted southward to plaintiffs' property. True, "floodwaters" might be directed in that direction, but all the evidence was that south was the direction the Hassayampa River flowed and that when in flood it still flowed south. In short, there is no evidence that defendants' paving the runway changed the actual course and direction of waters leaving the primary low channel of the Hassayampa River, except as to some theory of "braiding" which will be discussed later.

As to the existence of a "stream" on the western edge of plaintiffs' property this has previously been discussed in our comments concerning diversion of natural streams running across defendants' property. It need only be added that the lay of the land was such that waters, whether flood, stream, or surface, entering on defendants' property would naturally flow to the west thence along the three or four foot high bank forming the western edge of the Hassayampa River and finally, onto plaintiffs' land. There is no evidence that defendants' improvements changed this course, and in fact, after the improvements were in place, all the testimony was that this is exactly where the water flowed. We, therefore, hold that there was no evidence to support a jury verdict based upon defendants' artificially channeling, either stream or surface water onto plaintiffs' land.

This then brings us to plaintiffs' third and final theory of liability. This theory is that the construction of the airport runway near the primary channel of the river had two effects: (1) to cause water flowing in the primary low flow channel of the river to be diverted out of that channel and onto plaintiffs' land and (2) once these waters left the primary low flow channel of the river, they were unable to return to it because of the obstruction caused by the runway.

There is simply no evidence to support this first effect advanced by plaintiffs. All of the aerial photographs and especially those taken during construction of defendants' improvements clearly indicate that the paved runways stopped quite a distance from the primary low flow channel of the river. Thus, it was a physical impossibility for this runway to affect water flowing within the boundaries of the primary low flow channel or to divert waters from that channel.

As to plaintiffs' second contention concerning the effect of the runway, it was agreed that the Hassayampa River is a "braiding river," that is, within wide, well-defined boundaries, the primary flow channel of the river will shift, ranging out of established boundaries and then work itself back into these boundaries in somewhat of a "braiding action." The evidence showed that in September and December, 1965, water broke out of the

primary, low flow channel of the Hassayampa immediately north of the air strip. However, again the physical evidence is equally clear, as was pointed out by plaintiffs' expert from aerial photographs taken after the flooding, that the water did in fact cross the runway and therefore this runway could not have impeded the "braiding" effect of the Hassayampa. To summarize, there is no evidence that the construction of the runway caused a diversion of the Hassayampa onto plaintiffs' property or impeded its return to its normal channel.

The defendants have raised several grounds of error other than that the verdict of the jury was unsupported by the evidence. However, having found that the defendants must prevail on this ground, we need not discuss the other alleged grounds of error.

As a final comment, the Court need only add that the evidence was abundant that in September and December of 1965 and in December of 1967, the Hassayampa River broke out of its normal low flow channel; that when it did so, it followed an old secondary channel which coincidentally formed the western boundaries of both plaintiffs' and defendants' property; that in following this secondary channel it flooded the Wilmeth property located north of defendants' property, the Ramada property located north of the Wilmeth property and the Jarvis property located north of the Ramada property, as well as the defendants' property and the plaintiffs' property. The water which originally deposited the top soil and caused the existence of the bench lands upon which plaintiffs and defendants built, returned in 1965 and 1967.

Judgment for the plaintiffs is reversed and the matter remanded to the trial court with directions to enter judgment for the defendants.

EUBANK and HAIRE, JJ., concur.