517 P.2d 515

CAMPBELL ESTATES, INC., an Arizona corporation; Allen H. Geyer, and if married, Jane Doe Geyer, his wife, Appellants,

v.

Jessie E. BATES, a single woman; Jessie W. Ott, Individually and as surviving joint tenant of Burl E. Ott, Deceased, and James Whitney Ott and Kristina Ott, husband and wife, Appellees.

No. 2 CA–CIV 1426.

Court of Appeals of Arizona, Division 2.

Dec. 31, 1973.

Rehearing Denied Jan. 30, 1974.

Review Denied Feb. 19, 1974.

D'Antonio & Videen, by Garven W. Videen, Tucson, for appellants.

William S. Dunipace, Tucson, for appellees.

## OPINION

HATHAWAY, Chief Judge.

Defendants Campbell Estates, Inc. and Allen H. Geyer appeal from a superior court judgment in favor of plaintiffs, Jessie E. Bates, Jessie W. Ott, James Whitney Ott, and Kristina Ott. After trial to the court sitting without a jury, judgment was entered quieting plaintiffs' title to a disputed strip of land, enjoining defendants from trespassing upon the plaintiffs' land, ordering defendants to remove any mobile homes or other obstructions they had placed upon the disputed parcel, and awarding plaintiffs $2,000 actual and $5,000 punitive damages.

Defendants first ask us to examine the sufficiency of the evidence to support that portion of the judgment holding that plaintiffs had title to the strip of land in question. Both defendants and plaintiffs own fairly large parcels of realty upon which each operates a trailer court or mobile home park. The northern boundary of defendants' property meets the southern boundary of plaintiffs' property. The boundary line runs east to west and is 332.-20 feet in length. Both parties' respective chains of title contain overlapping legal descriptions to the extent that both parties purported to hold title to a strip of land 15.34 feet wide (north to south) by 332.20 feet long (east to west) which runs along the common boundaries of the mobile home parks. It is undisputed that both parties and their predecessors regularly paid property taxes assessed against this strip of land for at least five years prior to the commencement of this action.

For about 30 years there had been a barbed wire and post fence running east to west along the 332.20 foot boundary and located somewhere upon the disputed strip of land. Less than one month before plaintiffs brought this action, defendants, using heavy earth-moving equipment, tore down the old fence with the intention of replacing it with a new chain link fence. About a week afterwards, defendant Geyer notified plaintiffs that their fence had been on his property and offered to split the disputed area (i. e., erect his fence 7 to 8 feet north of the southern line of the disputed area). Plaintiffs refused and promptly filed this action.

Defendants asserted at trial that the old fence had run approximately down the center of the contested strip. If true, this

would mean that defendants and plaintiffs had each been in possession of about one-half of the disputed area when the fence was torn down (i. e., each had controlled an area 7 to 8 feet wide by 332.20 feet long). On the other hand, plaintiffs asserted that the fence had run along the southern line of the contested parcel. If this were proven to be true, plaintiffs would have been in control of the entire 15.34 by 332.20 foot parcel before the fence was torn down. Because there was undisputed evidence that both owners and their predecessors had occupied and used their land up to the fence line peaceably, openly and notoriously for at least 30 years and that neither owner had ever claimed any land on the opposite side of the fence, the location of the fence became the crucial issue. Both plaintiffs and defendants in effect conceded that the other and/or his predecessors had acquired by adverse possession the property on his side up to the fence line under A.R.S. § 12–521 et seq.

In reviewing the record we must interpret the evidence as a whole in the light most favorable to upholding the judgment. Almada v. Ruelas, 96 Ariz. 155, 393 P.2d 254 (1964); Todaro v. Gardner, 72 Ariz. 87, 231 P.2d 435 (1951). This general rule should be particularly observed on this appeal since the trial judge visited and personally viewed the site of the property in dispute. See Ellingson v. Fuller, 20 Ariz.App. 456, 513 P.2d 1339 (1973).

Robert Kelch, a registered land surveyor, testified that in 1969, when the fence was still standing, he surveyed the plaintiffs' property according to the legal description found in the chain of title. He stated that he placed surveyor's stakes or pins on both the southeast and southwest corners of the Ott property according to said legal description (i. e., including the disputed strip of land within the corner markers). Although Mr. Kelch vaguely remembered a fence along the south line, he made no notes or comments as to its location. He did find old stakes and pins which had been set directly east and west of the corner pins he set and which included the disputed area within the plaintiffs' property. Mr. Kelch later testified that it was the policy of the firm for which he worked to note a fenceline only when it was not located exactly on the property line as determined by the survey. He then would bring the discrepancy to the owner's attention. He had determined that the plaintiffs' parcel included the disputed strip of land. The trier of fact could easily have drawn an inference from Mr. Kelch's silence in his report that the fence had been located on that southern boundary line and had enclosed the disputed parcel within the Otts' mobile home park.

Moreover, Mrs. Ott testified that she had observed the surveyors in 1969 and was present when Mr. Kelch set the pin on the south line. She testified that he set it "right on top" of the south fence. This testimony also supports an inference that the disputed area was completely north of the destroyed fence and had been under the Otts' control.

On the fourth and last day of the trial, James Whitney Ott and Kelch both testified that they had been out to the disputed area the day before and had found two bent steel posts located on a line between the two southern corners Kelch had set in 1969. Kelch testified that he believed they were part of the fence he had seen in 1969. James Whitney Ott testified that they were two of three steel posts which had been in the fence along the southern boundary. He further testified that he had also found some barbed wire in the dirt along the same line. If the fence had stood on a line on which the posts and wire were found, it would have enclosed the entire disputed area within plaintiffs' property.

Mr. Allen Geyer, the owner of Campbell Estates, testified on direct examination that he had no knowledge of any land dispute before tearing down the fence in January of 1971. However, on cross examination, he stated that as early as 1968 surveyors had told him there was a possible "discrepancy" as to the location of the fence at

the southeast corner of the plaintiffs' property. Aside from the fact that the testimony is somewhat contradictory, the trier of fact could have concluded that a reasonable man would not have torn down a fence if it had been located in the position he later claimed it had been in—7 to 8 feet north of the southern line of the disputed parcel.

Mrs. Ott testified that one week after destruction of the fence, Geyer had told her that the fence had been 15 to 16 feet over on his property and had offered to split the disputed parcel. This also supports plaintiffs' position that the disputed strip of land had been entirely north of the fence line.

■ On the basis of the aforementioned testimony taken together with other evidence, we hold that there was sufficient evidence to support a finding that the entire disputed area was located north of the torn down fence and had been completely under plaintiffs' control.

The next issue on appeal is whether the trial court erred in ruling in plaintiffs' favor on Count II of their complaint. Count II alleged that defendants had changed the contours of their land by the use of bulldozers and had created a flood channel which would empty all of its floodwaters from defendants' property onto a portion of plaintiffs' property upon which house trailers of their tenants were located.

Soon after defendants acquired the property to the south of plaintiffs in 1970, they sought rezoning of the property which would allow them to construct and operate a mobile home park. As a condition to the rezoning, the City of Tucson, on the advice of the City Engineer's office, required that defendants improve the natural, then-existing drainage on the property. Defendants' newly acquired property was higher than plaintiffs' property to the north, and during heavy rains water ran from south to north. Defendants hired engineers who surveyed the property and developed plans to construct a drainage ditch on the property. A ditch was to run from east to west along the entire southern boundary of defendants' property and intercept all water flowing onto it. A channel was then to be constructed which would flow out of this east-west ditch and carry the water northwest across defendants' property and empty it onto plaintiffs' southern boundary. The ditch was to be 30 feet wide and 3 to 4 feet deep. Defendants' entire parcel was also to be graded so that all rain waters would drain into this ditch. The City approved these plans and defendants thereafter carried them out. Defendants then constructed a paved road through their property and began installing mobile homes.

The development was near completion by the summer of 1971. During the summer rainy season, large quantities of water emptied out of the mouth of defendants' newly constructed ditch and onto plaintiffs' property. Apparently some water flowed in a northwest direction across plaintiffs' southwest corner and onto neighboring property. However, water did back up onto plaintiffs' property approximately 200 to 250 feet due north of the mouth of defendants' ditch about 4 or 5 times during the rainy season. Admitted into evidence were plaintiffs' pictures which showed the flowing water to be 4 to 8 inches deep. They testified that several of their tenants had complained and had threatened to move.

Plaintiffs testified that they had not had any problems with water on their land before defendants' development. Defendants presented evidence that there had been a natural watercourse or wash which had drained their land before its development. However, the asserted watercourse apparently ran across defendants' land considerably to the east of the newly constructed ditch. Defendants presented evidence that it had released water at the point where the new ditch released water. Plaintiffs presented evidence that before development of defendants' property, the waters flowing across it had been surface waters which had not been contained in a natural water-

course or wash and had not materially affected plaintiffs' property. The resolution of this factual question was difficult at trial since defendants' grading had altered the land and had destroyed any evidence as to its natural drainage pattern. The resolution of the question was also crucial to the trial court's decision since the law applicable to surface water differs sharply from that applicable to water flowing in streams. On appeal the issue is further complicated since there were no express findings of fact made by the trial court.

In Diedrich v. Farnsworth, 3 Ariz.App. 264, 413 P.2d 774 (1966) rev. den. 1966, we held that water which intermittently flowed in a well-defined wash, arroyo or ravine was to be considered water flowing in a watercourse or stream and not surface water. We then applied a widely accepted rule quoting from 56 Am.Jur., Waters § 14, p. 504 (1947), the following:

> "There can be no doubt as to the right of a landowner to divert or change the course of a stream flowing through his land, provided he returns it to its original or natural channel before it reaches the land of the lower owner." 3 Ariz. App. at 273, 413 P.2d at 783.

Defendants argue on appeal that the evidence was insufficient for the trial court to have found the pre-existing, natural drainage on their land to have consisted of surface waters. They argue that the evidence of a watercourse or wash is undisputed, that all the evidence showed that the watercourse released water in the same spot as the new ditch, and that the above quoted rule of the *Diedrich* case absolves them of liability.

Plaintiffs argue that there was sufficient evidence to support a finding that the waters crossing defendants' land prior to its development had been surface waters. They then cite Arizona authority holding that a landowner has no right to collect surface waters in an artificial channel and discharge them in large quantities upon the land of a lower owner to his damage.

Maricopa County Municipal Water C.D. No. 1 v. Warford, 69 Ariz. 1, 11, 206 P.2d 1168, 1174 (1949); Southern Pacific Co. v. Proebstel, 61 Ariz. 412, 417, 150 P.2d 81, 83 (1944); Roosevelt Irrig. Dist. v. Beardsley Land & Investment Co., 36 Ariz. 65, 282 P. 937 (1929); Kirkpatrick v. Butler, 14 Ariz.App. 377, 380, 483 P.2d 790 (1971).

In Southern Pacific Co. v. Proebstel, supra, our Supreme Court, quoting from Mogle v. Moore, 16 Cal.2d 1, 104 P.2d 785, 789 (1940), defined surface waters as "surface drainage falling on or flowing from a tract or tracts of land before such waters have found their way into a natural watercourse." The court then compared stream waters:

> "Streams are usually formed by surface waters gathering together in one channel and flowing therein. The waters then lose their character as surface waters and become stream waters  .  .  . (A) continuous flow of water is not necessary to constitute a stream and its waters stream waters." 61 Ariz. at 418, 150 P.2d at 83.

In Water Conservation Dist. No. 1 v. Cotton Co., 39 Ariz. 65, 85, 4 P.2d 369 (1931), the Supreme Court further defined the elements of a natural watercourse or stream:

> "(T)he essential characteristics of a watercourse are a channel, consisting of a *well-defined* bed and banks, and a current of water. And the best reasoned cases go to the extent that without all these characteristics there can be no water course. (Citations omitted)." (Emphasis added)

■ We disagree with defendants' contention that the evidence compels an inference that the waters in question flowed across their land in a channel or wash with a "well-defined" bed and banks.

Douglas Massingill, a City Engineer, testified as follows:

> "Q. You do have something to do with making sure that trailers don't set

in puddles or in ponds that collect after storms, is that right?

A. Yes, we try to, you know, to work out the drainage problems as we go along.

Q. Now, when you granted a permit to Mr. Geyer [one of defendants], what was the condition that you placed on his use of that property for a trailer park as far as the handling of surface waters?

A. We wanted him to make some provision for surface waters. We knew that surface waters entered this tract and we wanted him to provide a means for them to get across the tract."

Mr. Massingill also testified that he did not know of or remember any existing channel running across defendants' property before its development. It is difficult to believe, in light of this testimony, that the City would have required defendants to construct a ditch to intercept and carry water across their property had there been a preexisting wash with well-defined banks which, if reinforced at the banks, would have served the same function.

Louis Allen, a draftsmen in the Office of the City Engineer, testified that he had made a drainage study of the general area before defendants' development. He further stated, while observing an aerial photo, that "there is no defined stream or arroyo or ditch as most people would tend to think of it, but the basic thread of the channel can be found." He also testified that the "surface waters" were located where the vegetation is apparent on the aerial photographs.

Defendants' own engineer, Mr. Paul Cella, after looking at a picture of defendants' property before development, testified at one point that "there is no well-defined streambed there, but there is an existing drainage course. Doesn't have steep sides."

Plaintiffs introduced into evidence two aerial photos of the area which were taken in 1967 and 1969 before defendants' development. There is no indication of a wash or streambed running across the property. There is heavy vegetation which would indicate a drainage pattern. However, the vegetation does not run in a thin line but fans out over a wide area.

In drawing the plans for the grading and construction of the new ditch, defendants' engineers prepared a contour map of the property. It contained no sketch or outline of any well-defined wash or streambed.

Although defendants presented considerable evidence tending to show a stream or natural watercourse, which had released water onto plaintiffs' land where the mouth of the newly constructed ditch was placed, we will not substitute our judgment for that of the trial court, in view of the conflicting evidence on the point. Apparently the court concluded that defendants had committed an actionable wrong in collecting surface waters in an artificial channel and discharging them onto the plaintiffs' land. There is the requisite evidentiary support in the record.

■ We find no merit to defendants' contention that they should be relieved of liability because the City required and approved the ditch. They were not forced to do anything—the City only required the ditch as a condition precedent to rezoning and development. Defendants developed their property on their own initiative and they should be liable for any resulting damage they cause adjoining property owners.

Defendants next contend that their drainage development caused plaintiffs no damage and that the trial court erred in awarding plaintiffs $2,000 on Count II of their complaint. It was shown at trial that plaintiffs had two tenants living in house trailers situated on high ground in the southwest corner of their property. During rains, the flow from the mouth of the newly constructed ditch made this high

ground a virtual island and easy access to the trailers was cut off by the running water.

■ Plaintiffs proved no permanent damage to their real property from the flooding during the summer of 1971. However, their witness, Mr. Massingill, testified that plaintiffs would have to construct across their southwest corner a shallow ditch thirty feet wide and one hundred feet in length in order to avoid future flooding. One of the plaintiffs, Mr. James Ott, testified that in order to facilitate access to the two trailers, a culvert would be required at the intersection of the ditch and the road leading to the two isolated trailers. Mr. Houston Gilbert, who had estimated the cost of many construction projects, testified that the ditch excavation would cost approximately $200 and the culvert installation would cost about $2,000.

Both parties agree that the purpose of the damages award was to compensate plaintiffs for the costs they would incur in preventing the flooding and providing access to the two trailers in the southwest corner during rains. Defendants argue that since they did not have culverts where their roads intersected the ditch, plaintiffs would not need one. However, the trial court could have concluded to the contrary in view of Mr. Ott's testimony and from her inspection of the premises. Moreover, defendants had paved roads running across their ditches whereas plaintiffs had only dirt roads. We find sufficient evidence to support the court's determination as to the necessity of a culvert to correct the condition caused by defendants' ditch.

■ Defendants next assert that plaintiffs failed to minimize their damages. Plaintiffs admitted at trial that they had refused defendants' offer, when excavating their ditch, to extend it across plaintiffs' southwest corner free of charge. The defendants overlook the fact that if the court based its award on Mr. Gilbert's estimate (which was the only estimate), it did not include the estimated $200 cost of a ditch.

The court only awarded plaintiffs $2,000 which was the estimated cost of installing a culvert. Defendants' prior offer had not included a culvert. Thus the court, in disallowing the $200 cost of a ditch, apparently considered the plaintiffs' duty to minimize damages.

■ Defendants' final attack is directed to the allowance of punitive damages in the sum of $5,000. The purpose of punitive damages is not to compensate the injured party, but rather to punish the wrongdoer. Price v. Hartford Acc. & Indem. Co., 16 Ariz.App. 511, 494 P.2d 711 (1972). They may be awarded where there has been a "reckless indifference to the interests of others." Nielson v. Flashberg, 101 Ariz. 335, 341, 419 P.2d 514, 520 (1966); Santa Fe Pacific R. Co. v. Cord, 14 Ariz.App. 254, 482 P.2d 503 (1971).

■ As noted above, Mr. Geyer testified that he had been unaware of any fence line dispute at the time he destroyed the fence. On cross examination, however, he admitted that in July, 1968, more than two years before the fence was torn down, he had warned plaintiffs "not to place anything permanent on the premises." According to him, he gave this warning because he had been informed by a surveyor of his property to the east of the plaintiffs that the east-west fence might not have been on the east-west boundary line at the southeast corner. Knowing that there was a possible discrepancy at the southeast corner, Mr. Geyer deliberately bulldozed the fence in January, 1971. He apparently made no effort to mark its location.

Moreover, prior to his destruction of the fence, Mr. Geyer had had a survey made of an area covering the disputed strip of land. Upon the plat produced, it was noted that "OTHER DISCREPANCIES SUCH AS THE NORTH-SOUTH DISTANCE . . . DO NOT CONFORM TO THE DEED DESCRIPTION . . . ." Although Mr. Geyer testified that he was not aware of the results of

this survey at the time of the destruction of the fence, we note that it was completed by November 4, 1970, over two months *before* the fence was torn down. Thus a reasonable inference is that Mr. Geyer was aware of the property dispute when he destroyed the fence and therefore his purpose was to destroy evidence in hopes that the plaintiffs would agree to split the deed overlap.

Defendants assert that they cannot be held guilty of reckless conduct in connection with the construction of the ditch when the plans were drawn up by engineers and approved by the City. These drainage specifications simply set standards which defendants' property was required to meet before it qualified for the requested zoning. In no way did the City purport to exonerate the defendants from any duty owed adjacent landowners.

Defendants' engineers prepared a Preliminary Drainage Study in August 1970 which was introduced into evidence. The proposed ditch was to empty onto plaintiffs' property "approximately 100 feet east of the west property line". However, the study noted that if the mouth of the ditch was moved west, it "may also help direct the channel into the natural downstream drainageway and avoid discharging an unnatural and concentrated flow upon the adjacent property." A surveyor's plat was introduced into evidence which plots out the actual ditch and which was prepared two months after the Preliminary Study. This plat indicates that the mouth of the ditch remained approximately 100 feet east of the west line.

Defendants constructed their thirty foot wide drainage ditch dumping all drainage directly onto plaintiffs' property. They did not consult or make arrangements with plaintiffs before doing this. They dug the ditch first and asked questions later. Plaintiff Mr. Ott testified that when he asked defendant Geyer the purpose of the ditch, Mr. Geyer replied that it was not a drainage ditch, but only a bridle path for horses. Accordingly, the evidence supports at least a finding of "reckless indifference to the interests of others" (Nielson v. Flashberg, supra) and an award of punitive damages.

Affirmed.

KRUCKER, J., concurs.

HOWARD, Judge (concurring in part, dissenting in part).

I concur in all respects with the majority opinion except as to the affirmance of the award of punitive damages.

The facts as set forth by the majority are somewhat misconstrued and not fully stated.

As far as the drainage ditch is concerned the evidence is uncontradicted and undisputed that the construction of the ditch was pursuant to instructions by the City of Tucson. Mr. Douglas Massingill, the city engineer, testified that the city required Mr. Geyer to construct the ditch, so that the water flowing across his property left the property at the lowest point. Mr. Geyer hired an engineer who determined the lowest spot on the north border of Geyer's property. The ditch was so constructed as to release the water at that point. The city engineer then approved the location of the ditch. Neither the city engineer nor Geyer's engineer were of the opinion that the new ditch would cause an increased water problem to the other property. Obviously they were wrong.

The evidence discloses that Geyer was required by the City to dedicate a bridle path across the property as part of the rezoning. He did so along the course of the ditch and the Otts knew that it was a drainage ditch and not merely a bridle path. What conduct do we have then, as far as the ditch is concerned, which would

support punitive damages? Geyer did what he was told to do by the City of Tucson. He acted upon the advice and requirements of the City and his own engineer.

Punitive damages should not be allowed unless there is a showing of wanton or reckless acts or spite or ill will. State Farm Mutual Ins. Co. v. St. Joseph's Hospital, 107 Ariz. 498, 489 P.2d 837 (1971). To constitute "wantonness" authorizing exemplary damages, the acts complained of must show not simply lack of due care, but that the actor must have realized the imminence of injury to others from his acts and refrained from taking steps to prevent the injury because indifferent to whether or not it occurred. Allman v. Bird, 186 Kan. 802, 353 P.2d 216 (1960).

The evidence concerning the construction of the drainage ditch does not support an award for punitive damages.

Nor do I believe that the bulldozing of the fence supports an award of punitive damages. Apparently the majority considers this act as an attempt to destroy evidence. I do not believe the evidence can admit of any such conclusion. The majority opinion fails to state that Mrs. Ott testified that Mr. Geyer asked her permission to tear down the old fence and replace it with a new chain-link fence. I find it rather strange that a man who is, according to the majority, acting wantonly, recklessly and out of spite and ill-will would first ask permission to remove the fence. I also find it difficult to believe that he was attempting to destroy evidence when the facts show that the corner posts of the fence were left in place, albeit bent. Mr. Geyer was never given the opportunity to place the fence back in the old position because suit was filed right after he proposed to split the difference. Furthermore, the fence was on his land according to his deed and the survey. I am unable to find any evidence whatsoever in the record to support an award of punitive damages.