Stewart L. UDALL, Secretary of the Interior, Appellant,

v.

BATTLE MOUNTAIN COMPANY, Appellee.

No. 21259.

United States Court of Appeals Ninth Circuit.

Oct. 18, 1967.

Rehearing Denied Nov. 28, 1967.

---

Edwin L. Weisl, Jr., Asst. Atty. Gen.,
A. Donald Mileur, Atty., Lands Division,
Dept. of Justice, Washington, D. C., Sid-
ney I. Lezak, U. S. Atty., Portland, Or.,
for appellant.

Wm. B. Murray, Portland, Or., for
appellee.

Before JERTBERG and MERRILL,
Circuit Judges, and TAYLOR, District
Judge.

MERRILL, Circuit Judge:

Battle Mountain Company initiated
these proceedings to secure review of an

administrative decision of the Secretary of the Interior rejecting the right of Battle Mountain to the selection of public lands in lieu of forest lands relinquished to the United States by Santa Fe Pacific Railroad Company in 1908. Battle Mountain claimed its forest lieu selection right through 1915 assignments from Santa Fe. The administrative decision rejecting its claim was pursuant to the position of the Secretary that such rights are not assignable and, as to Battle Mountain, had been extinguished by the Government's 1956 reconveyance to Santa Fe of the forest lands theretofore relinquished.

On review of this decision the District Court reversed, holding that the rights asserted by Battle Mountain were valid and must be respected by the Secretary. Linn Land Co. v. Udall, 255 F.Supp. 382 (D.Ore.1966). This appeal followed.

The sequence of events involves and spans various Public Lands Acts.

*The Act of June 4, 1897, 30 Stat. 36.*

In the late 1800's the creation of forest reserves was initiated, primarily from the public domain. Difficulties in consolidating reserves arose through the interference of prior land grants, particularly those to land grant railroads.

On June 4, 1897, Congress passed an act providing that where lands in private ownership or subject to bona fide claim lay within the limits of a forest reservation, the settler or owner might relinquish the tract to the government and select in lieu thereof a tract of vacant public land of equivalent area.

In 1898 the San Francisco Mountains Forest Reserve was established in what is now the State of Arizona. Prior land grants to the Atlantic and Pacific Railroad, predecessor of the Santa Fe, left only alternate sections available for the reserve. Since the checkerboard nature of the reserve presented administrative problems, negotiations were commenced by the Government to secure the railroad's relinquishment of its forest lands. On January 11, 1901, Santa Fe undertook, with the agreement of the Secretary, to surrender its title to the odd-numbered sections in the forest reserve. Correspondence setting out the agreement was exchanged in March and April, 1902.

In 1905 Congress repealed the 1897 Act so far as it related to forest lieu selection rights (33 Stat. 1264), but a savings clause preserved contracts theretofore entered into by the Secretary. On November 28, 1908, the lands here involved were conveyed by Santa Fe to the United States.

In 1915, by two powers of attorney, Santa Fe authorized attorneys-in-fact to exercise its right to the selection of lieu lands. It is through these two instruments, to which it has succeeded, that Battle Mountain asserts its present claim.

*The Act of September 22, 1922, 42 Stat. 1017.*

Uncertainties arising where exchanges under the 1897 Act were incomplete or were defeated by the Act of 1905 created clouds on the title of original owners of lands relinquished to the United States. To remedy this situation Congress, in 1922, passed an act permitting the United States to quitclaim relinquished base lands back to the original owner. The act provided:

"That where any person or persons in good faith relinquished to the United States lands in a national forest as a basis for a lieu selection * * * and failed to get their lieu selections of record prior to [repeal of the Act of June 4, 1897] * * * or whose lieu selections, though duly filed, are finally rejected, the Secretary of the Interior * * * upon application of such person or persons, their heirs or assigns, is authorized to * * * relinquish and quitclaim to such person or persons, their heirs or assigns, all title to such lands which the respective relinquishments of such person or persons may have vested in the United States".

This act by its terms lapsed in five years but was, to the extent relevant

here, reinstated by the Act of April 28, 1930, 46 Stat. 257.

*The Recording Act of 1955, 69 Stat. 534, 43 U.S.C. § 274 Note.*

The Act of 1897 was but one of many acts by which Congress had authorized the grant of rights to selection and claim of public lands. In most instances these rights did not result from exchange of lands desired by the Government, but were granted for the purpose of creating incentive for settlement or of compensating for military or other service to the country. Many of such rights, known as "scrip," were freely transferred.

In 1955, concerned about the extent of floating scrip and dormant land claims and desirous of knowing the extent of the Government's unfulfilled obligations respecting public lands, Congress passed an act requiring recordation of all such claims, including claims to forest lieu selection rights. It was provided that if such claims were not recorded within a two-year period they would not be accepted as a basis for the acquisition of land.

In 1956 Santa Fe, proceeding pursuant to the Act of 1922 as extended by the Act of 1930, requested reconveyance of the lands it had relinquished nearly 50 years earlier. No one had appeared with the 1915 powers of attorney to claim a lieu selection and Santa Fe believed, apparently in good faith, that the powers of attorney had been lost. Acceding to this request the Government, in 1956, quitclaimed back to Santa Fe the base lands formerly relinquished to the United States.

The following year, within the period prescribed by the 1955 Act, Battle Mountain's predecessor in title recorded the 1915 powers of attorney. In 1961 Battle Mountain filed to exercise its lieu selection rights.

On July 28, 1961, the Case-Processing Section of the Bureau of Land Management rejected Battle Mountain's claim, and the rejection was upheld on appeal within the Department of the Interior. This suit followed.

*The question of assignability.*

The case presents the question whether the 1915 powers of attorney were transfers the Government was obligated to respect. If they were, then the Department had acted rashly and improvidently in quitclaiming the base lands back to Santa Fe. If they were not, then all lieu selection rights were effectively extinguished by the reconveyance of the base lands upon which those rights depended.

As we have noted, the Act of 1897 was but one of many acts by which Congress had authorized the granting of rights to selection and claim of public lands. In most of the acts the rights expressly were made either assignable or nonassignable. On this question the 1897 Act is silent.

The position of the Department from the outset has been made clear, however. Since the right of selection under the Act ran to "the settler or owner" of the relinquished base lands, the Government would deal only with him or a duly authorized agent or attorney. In the eyes of the Department the rights did not constitute assignable scrip.

"Instructions Relevant to Forest-Reserve Lieu Lands Selection," 31 L.D. 372, issued in 1902, contains this provision:

> "19. A selection based upon land covered by a patent or patent certificate must be made by the owner of the land relinquished or by a duly authorized agent or attorney-in-fact; and when made by an agent or attorney-in-fact, proof of authority must be furnished."

To this effect were decisions of the Department in F. A. Hyde, et al., 28 L.D. 284 (1899); John K. McCormack, 32 L.D. 578 (1904); Albert L. Bishop, et al., 33 L.D. 139 (1904); Hammond Lumber Co., 46 L.D. 479 (1918).

Further it was early made clear that a power of attorney was to be regarded as precisely that, and that patents would issue only to the principal. The agent was not to be treated as an assignee. Heirs of George Liebes, 33 L.D. 458 and

460 (1905); California Door Co., 52 L.D. 644 (1929).

A clear expression of the departmental construction and a review of the decisions on which it rested are found in George L. Ramsey, by Ted E. Collins, 58 I.D. 272, 294–95 (1942), where it was stated:

" * * * From the beginning however dealers and speculators in public land rights have persisted in treating the exchange right as scrip, a floating, assignable right, and have made persistent efforts to persuade the Department to this view. But the Department early decided that no floating right was intended by the Congress; that this law does not provide for the issuance of scrip in any form or for the certification of a right of selection; and that to speak of a 'scrip right' or 'scrip land' under this legislation is inaccurate and tends to confuse and mislead.

Under the act the Department had no power to *prevent* assignment and scrip treatment of the exchange right by its owner * * *. It could not require applicants to submit proof that they had not sold or assigned or contracted to sell or assign, directly or through irrevocable power of attorney, either their right to select or the selected lands themselves. But it could and did *refuse to recognize assignments and assignees.*

The Department has therefore repeatedly held * * * that patent will not issue to an assignee but only to the owner of the base lands. Its position has been that if an owner who contemplates an exchange with the Government chooses to contract privately for the sale of his interest in selected lands in advance of their being patented to him, his transferee has no privity with the Government, will not be recognized by it and can make no demands upon it; and that no questions arising between the owner and his transferee upon such sale are any concern of the Government's."

■ We regard this as a reasonable construction of the Act. Since the relinquishment to the United States contemplated a completed exchange of lands an equity in the nature of a right to rescission remained with the owner of the relinquished land until the exchange had been completed and it was not until then that the United States might be regarded as vested with unconditional ownership. It was reasonable under these circumstances to regard the selection right as appurtenant to the owner's equity.[1]

That deference is to be given to such administrative construction was made clear in Udall v. Tallman, 380 U.S. 1, 16, 85 S.Ct. 792, 801, 13 L.Ed.2d 616 (1965), where the Supreme Court said:

"When faced with a problem of statutory construction, this Court shows great deference to the interpretation given the statute by the officers or agency charged with its administration. 'To sustain the Commission's application of this statutory term, we need not find that its construction is the only reasonable one, or even that it is the result we would have reached had the question arisen in the first instance in judicial proceedings.' Unemployment Comm'n of Territory of Alaska v. Aragon, 329 U.S. 143, 153, 67 S.Ct. 245, 250, 91 L.Ed. 136. See also,

---

1. Although we agree with the District Court that the Anti-Assignment Act, 31 U.S.C. § 203, does not bar Battle Mountain's claim, the rationale behind that Act, as set forth in United States v. Shannon, 342 U.S. 288, 291, 72 S.Ct. 281, 96 L.Ed. 321 (1952), is analogous to that which lies behind the Interior Department's longstanding interpretation of what the 1897 Act requires. The United States should not be required to investi-gate alleged assignments and determine the rights of several parties *inter se*, but rather should be able to deal with the original transferee of base lands or holder of a money claim, and let other claimants sue him on their assignments. So it is in this case. Nothing we say here reflects on the right of Battle Mountain to sue Santa Fe on the powers of attorney it executed in 1915.

e. g., Gray v. Powell, 314 U.S. 402, 62 S.Ct. 326, 86 L.Ed. 301; Universal Battery Co. v. United States, 281 U.S. 580, 583, 50 S.Ct. 422, 74 L.Ed. 1051. 'Particularly, is this respect due when the administrative practice at stake "involves a contemporaneous construction of a statute by the men charged with the responsibility of setting its machinery in motion; of making the parts work efficiently and smoothly while they are yet untried and new." ' Power Reactor Co. v. Electricians, 367 U.S. 396, 408, 81 S.Ct. 1529, 1535, 6 L. Ed.2d 924."

This policy was recently followed by our court in Assiniboine & Sioux Tribes v. Nordwick, 378 F.2d 426 (9th Cir. 1967). We there stated, in discussing the choice between conflicting constructions of an ambiguous statute:

"The consideration we find compelling * * * in this case is the virtually unbroken administrative practice [of the Department of the Interior] of issuing patents on pre-1927 homestead applications after passage of the 1927 Act without reserving oil and gas rights. This practice seemingly reflects a uniform contemporaneous interpretation of the 1927 Act by persons presumably familiar with its background and purpose, and we are persuaded by it." Id. at 432.

Appellee regards this clear administrative construction as nullified by an instance in which the holder of a power of attorney had been recognized by the Department as having a selection right and had been granted patent. There, in a dispute between the patentee and the owner of the base lands, the title of the patentee was upheld. Begue v. Grizzly Livestock and Land Co., 1 F.Supp. 229 (S.D.Cal.1932). The court did not reach the question before us. It simply dealt with rights as between the parties and refused to review the administrative decision that the patentee was entitled to recognition by the Government.

It is ironic but understandable that the single instance in which an exercise of administrative judgment under the Act has reached the courts should be one completely lacking in persuasion as to authoritative administrative construction. In Begue, the action of an inferior agent of the Department, being such as to avoid grievance, never reached the level of administrative appeal at which authoritative departmental determinations on behalf of the Secretary are made. We cannot permit the judgment of an inferior official to set at naught the otherwise clear departmental construction.

Nor do we think it of any consequence that the Interior Department, in its interdepartmental memoranda and bulletins, has itself referred to these lieu selection rights as "scrip," a term that should be reserved for a floating right issued in exchange for land. As noted in the quotation from George L. Ramsey, by Ted E. Collins, supra, the department recognizes the inappropriateness of the word in this context.

Battle Mountain directs us to Webster v. Luther, 163 U.S. 331, 16 S.Ct. 963, 41 L.Ed. 179 (1896), where the Supreme Court ruled in favor of assignability in interpreting another statute, similarly silent on the question, that authorized issuance of land selection rights. In that case, however, the Court found that despite contrary Land Department practice the "obvious purpose" of the 1872 Act conferring soldier's additional homestead rights was to allow free alienation of those rights. There is no such obvious purpose in the act before us, and the *Webster* Court itself emphasized the respect due administrative construction in doubtful cases. 163 U.S. at 342, 16 S.Ct. at 967.

Battle Mountain further contends that subsequent legislation has established the assignability of these rights, negating any inference to the contrary from administrative practice. Its principal reliance is upon the 1922 Act and its use of "heirs and assigns" in describing those entitled to reconveyance.

The Department, in construing this language, assumed that "assigns" in the context in which it was used referred to

transferees of title to the base lands rather than to transferees of the lieu rights. Collins Land Co., 51 L.D. 190 (1925); B. F. Felton, 52 L.D. 484 (1928); California Door Co., 52 L.D. 644 (1929).

■ This, in our judgment, is a wholly reasonable construction to which we should defer. It is consistent with the position of the Department under the Act of 1897. "Heirs and assigns" are fee simple words of art and their use, apparently in that manner, cannot be said unambiguously to have a different and broader construction. The Act of 1897, as we have noted, contemplated a completed exchange. If an unfinished exchange were to be undone it is not unreasonable to require that the base lands return to the one who can claim equitable ownership.

■ Battle Mountain also placed reliance upon the Recording Act of 1955. That Act, however, did not purport to commit the United States to recognize assignments not theretofore binding. Had the Act applied only to lieu rights and to rights expressly made enforceable against the Government there might be room for the view that Congress, in 1955, regarded lieu rights as assignable along with all the rest. The Act, however, covered rights expressly made nonassignable,[2] thus including claimants whose claims the Government was not bound to respect. It would seem, then, that Congress's principal purpose was to secure information. In the absence of clear expression we cannot conclude that it intended, on the basis of information yet to be disclosed, to obligate itself in any fashion beyond its already existing commitments.

There can be little doubt that the Interior Department acted unwisely and perhaps contrary to the spirit of the 1955 Act in dealing with Santa Fe without waiting out the recording period. However, this was an administrative judg-

ment which it is not our function to review.

Battle Mountain also calls our attention to the Acts of July 6, 1960, Pub.L. No. 85–596, 74 Stat. 334, and of August 21, 1964, 43 U.S.C. 274 Note. Here the United States unambiguously did commit itself to recognize assignees of forest lieu selection rights. The acts came too late to be of direct aid to Battle Mountain, but are cited to us as demonstrating Congressional construction of its obligations under the Act of 1897. We do not regard them as having that effect.

■ Legislative history shows clearly what Congress had in mind in 1960. It was concerned over the fact that public lands of the United States were being reconveyed under the 1930 Act (the successor of the 1922 Act) in "what the public press, conservation interests and others regard as being virtually a 'giveaway' of public resources approaching a scandal." S.Rep.No.1639, 86th Cong., 2d Sess. (1960). The 1960 Act repealed the provision permitting reconveyance. Instead, claimants were to be compensated at $1.25 an acre. (The 1964 Act provides compensation on a different basis as an alternative to selection of lands and includes all who had recorded under the 1955 Act.) Further the legislative history shows that the extent of recordation under the 1955 Act was carefully analyzed in order that the cost of such compensation might be anticipated.

Congress, then, was in 1960 retiring unexercised lieu selection rights for money. It was not dealing with public land. On a money basis, where land transfer was not involved and where the cost was predictable, it was willing to accept the consequences of recognizing the validity of assignments. We do not find in this manner of closing the book on forest lieu selection rights and meeting its outstanding land obligations anything inconsistent with the prior departmental construction of the Act of 1897.

**2.** E. g., Sioux Half-Breed scrip, issued under the Act of July 17, 1854, 10 Stat. 304, the second type of selection right mentioned in the Act.

We conclude that the departmental construction of the Act of 1897 is entitled to judicial recognition.

Judgment is reversed. The decision of the Secretary on the departmental appeal of Battle Mountain is reinstated.