482 P.2d 503

**SANTA FE PACIFIC RAILROAD COM-
PANY, a corporation, Appellant
and Cross-Appellee,**

v.

**E. L. CORD, Donald R. Wheeler, as Trustee,
Appellees and Cross-Appellants.**

**No. 1 CA–CIV 1250.**

Court of Appeals of Arizona,
Division 1.

March 15, 1971.

As Amended on Denial of Rehearing
April 15, 1971.

Review Denied June 8, 1971.

Fennemore, Craig, von Ammon & Udall, by John J. O'Connor, III, Phoenix, for appellant and cross-appellee.

Edward D. Neuhoff, San Marino, Cal., Jennings, Strouss & Salmon, by Thomas J. Trimble, Phoenix, for appellees Wheeler and Cord and cross-appellants.

HOWARD, Judge.

This appeal involves two lawsuits which were consolidated in the trial court. The pleadings which set forth claims and defenses of all the parties below were numerous and complex. The form in which the various claims were presented in the pleadings is not material and, therefore, no attempt will be made to detail the procedural manner in which the many questions involving this appeal first arose. Only three parties are involved in the appeal and the two cross-appeals. The sole appellant is

the Santa Fe Pacific Railroad Company, hereinafter referred to as Santa Fe. The two appellees are E. L. Cord and Donald R. Wheeler, as Trustee, hereinafter referred to as Cord and Wheeler, or at times, jointly as claimants. The briefs filed by the appellant and appellees are excellent and have been of great benefit to the court.

Prior to discussion of the facts in this case, a brief historical background will be beneficial.

The first half of the 19th century, the United States, by means of various treaties, acquired a vast new area of sparsely populated land in the south and west. Assimilation of this new territory with the older part of the country became a national problem because of the lack of efficient means of transportation between the two areas. Transportation was first provided by means of wagons, stage coaches and waterways. This method of travel was slow, and a more rapid and extensive means of transportation was obviously necessary. The building of railroads largely provided the solution to the problem. The railroads made it possible for the opening of the frontier. In order to encourage a rapid railroad building program, Congress chose to make public grants of a large proportion of the new lands to underwrite and subsidize the participation of private individuals and privately owned companies in the program. After July 27, 1866 (14 Stat. 292) the Atlantic and Pacific Railroad Company was created, and was given a grant of every alternate section of public land not mineral, designated by odd numbers, to the amount of 20 sections per mile on each side of the railroad line as designated by plat filed in the office of the Commissioner of the General Land Office. A total of 69 other railroads received comparable grants. In total, the public lands which were granted to the railroads were almost equal to the acreage of the New England states, New York and Pennsylvania combined.

The execution of the land-grant program was marked by innumerable complex and unforeseen difficulties; its course has been beset by claims and counterclaims asserted by and between the settlers, railroads and government. Congress, the executive agencies, and the courts have been repeatedly called upon to resolve these conflicting claims. Finally, Congress passed Section 321 of the Transportation Act of 1940, 54 Stat. 954, 49 U.S.C.A. § 65. The provisions of this Act will be set forth later in this opinion.

Returning to the facts in this case, the land granted to the Atlantic and Pacific Railroad Company eventually passed to the Santa Fe by virtue of a foreclosure of a mortgage made by the Atlantic and Pacific Railroad Company and the provisions of the Act of March 3, 1897, 29 Stat. 622.

On April 2, 1902, Santa Fe, together with the Aztec Land & Cattle Company, Saginaw and Manistee Lumber Company, William F. Baker, E. B. Perrin and Robert Perrin entered into a contract with the Secretary of the Interior by which they agreed to relinquish and deed their private and patented land holdings within the limits of the San Francisco Mountains Forest Reserve to the United States of America and to select other lands in lieu thereof, according to the provisions of the Act of Congress approved June 4, 1897, 30 Stat. 36, and the Act of Congress approved June 6, 1900, 31 Stat. 614. The Act of Congress approved June 4, 1897, 30 Stat. 36, provided in part:

"That in cases in which a tract covered by an unperfected bona fide claim or by a patent is included within the limits of a public forest reservation, the settler or owner thereof may, if he desires to do so, relinquish the tract to the Government, and may select in lieu thereof a tract of vacant land open to settlement not exceeding an area the tract covered by his claim or patent * * *"

Similar contracts to that referred to above were entered into by Santa Fe and the Secretary of the Interior covering the private and patented land holdings of Santa Fe in the Grand Canyon Forest Reserve on July 7, 1902.

On March 3, 1905, Congress repealed the 1897 Act as it related to Forest Lieu Selection Rights. 33 Stat. 1264. A savings clause, however, preserved the contract rights of Santa Fe and others based upon the aforesaid contracts with the Secretary of Interior. No time for the exercise of the Forest Lieu Selection Rights was specified in the 1905 Enactment of Congress.

Pursuant to the contracts of April 2, 1902 and July 7, 1902, referred to above, the Santa Fe during years 1902, 1904, 1909 and 1910, conveyed to the Government of the United States, parcels of real property involved in this action, all of which lands had been patented to Santa Fe by the Federal Government. In exchange therefor, the Santa Fe received the rights to select other government owned lands of a comparable acreage, pursuant to 30 Stat. 36, 31 Stat. 614, and the savings clause in 33 Stat. 1264.

Commencing in the year 1902 and continuing until the year 1917, Santa Fe sold all of its right, title and interest in various Forest Lieu Selection Rights, including all rights incident and appurtenant thereto, for a valuable consideration, to third parties. Pursuant to the plan and device adopted by Santa Fe for the purpose of selling said rights, they executed and delivered to various persons at the time of sale, a Deed of Relinquishment to the United States Government, an Abstract of Title, and a Power of Attorney pertaining to the base lands involved in this case. This Power of Attorney authorized the attorney-in-fact to select lands in lieu of the relinquished base lands reconveyed to the Government of the United States. Such selections were to be made in the name of Santa Fe. Furthermore, an additional power of attorney was issued to authorize the attorney-in-fact to convey the lands selected in lieu of their relinquished base lands in the name of Santa Fe. In cases in which the second power of attorney, to convey the selected lands, was not executed and delivered at the time of sale, upon exercise of the power to select and the patenting of the lieu lands to the Santa Fe, Santa Fe would then quit claim the selected lands to the one making the selection, or execute and deliver at a later date to the holder of the power of attorney to select, the power of attorney to convey. The space for the name of the attorney-in-fact in all powers of attorney was left blank, and it was with the express purpose and intent of Santa Fe that the purchaser or any successor in interest of such purchaser to whom the power or powers of attorney might be sold, transferred or delivered, should have the right to fill their name in the blank and thereafter to act as attorney-in-fact under said powers for Santa Fe, at any time they should elect. Concurrently with the original delivery of such power or powers, the base lands described in the powers of attorney were reconveyed by Santa Fe to the United States of America and the Deed recorded, or the base lands had prior thereto been reconveyed by Santa Fe to the United States of America, and the Deed recorded.

The first sales of the selection rights, as evidenced by the blank powers of attorney and other supporting documents, were made by Santa Fe primarily to dealers in such rights.

By the delivery of such blank powers, Santa Fe intended that such rights could be sold and transferred by mere delivery of the powers of attorney from one party to another without a formal written assignment or chain of title.

The purpose of Santa Fe in selling such Forest Lieu Selection Rights was to raise money for its business and operation. The sale of the powers of attorney and other supporting documents by Santa Fe was at the fair market value thereof and a valuable consideration was received by Santa Fe from the original purchasers.

The powers of attorney and other supporting documents were purchased or acquired by Cord and Wheeler for valuable consideration and at the time of such acquisition, the powers of attorney, insofar as the names of the attorneys-in-fact were concerned, were blank.

In 1955 to 1959, one Ernest O. Buhler and Mildred B. Buhler entered into a written agreement with the alleged heirs at law of the original purchasers of the powers of attorney sold by Santa Fe, wherein and whereby the Buhlers were to acquire back the base lands from the U. S. Government and share in the profits resulting from the reconveyance of such lands.

Ernest O. Buhler solicited and obtained the aid and cooperation of Santa Fe in obtaining the lands involved in this case back from the U. S. Government for the heirs of the original purchasers of the powers of attorney from Santa Fe and in 1955, 1956 and 1957, Santa Fe, at its own request, obtained quit claim deeds for the base lands from the U. S. Government without the knowledge or consent of Cord and Wheeler, the owners of the Forest Lieu Selection Rights pertaining to the base lands.

After Santa Fe received the base lands back from the United States of America by quit claim deed, it, prior to April 1, 1955, conveyed a portion of these lands for which Cord and Wheeler had powers of attorney, to the heirs of the original purchasers of the powers of attorney for the Forest Lieu Selection Rights who had entered into contracts with Ernest O. Buhler. No further conveyances of the base lands were made by Santa Fe to the heirs of the original purchasers of the powers of attorney since the dispute arose between Ernest O. Buhler and Santa Fe as to who was entitled to the base lands.

To resolve this dispute between Santa Fe and Buhler, Santa Fe, on January 21, 1958, entered into the following plan with Ernest O. Buhler. As to any base lands received from the United States of America against which there was an adverse claim, the base lands would not be conveyed by Santa Fe to any persons or parties who had entered into agreements with Ernest O. Buhler. That as to such base lands, Ernest O. Buhler would obtain a quit claim deed from the heirs of the original purchasers of the powers of attorney from Santa Fe, and Ernest O. Buhler would occupy such base lands and pay taxes thereon for the statutory period, and thereafter Ernest O. Buhler would bring his quiet title on the basis of such adverse possession. In the event a holder of the powers of attorney sold by Santa Fe appeared and had a better claim for the base lands than the heirs of the original purchasers of the powers of attorney, Santa Fe would give them a deed to such base lands and let such holders of the powers of attorney to the lands take any action that might be necessary against Ernest O. Buhler. In the event no such claim was made to the base lands, Buhler would obtain title to the lands allegedly being held in trust by Santa Fe for the owners of the powers of attorney, and Buhler would become the owner of the base lands by court decree after occupancy adversely for five years and the payment of taxes due.

In October, 1958, Ernest O. Buhler died and his widow, Mildred B. Buhler, entered into the same agreement that her husband had made with Santa Fe.

Santa Fe paid no taxes on the base lands after they were quit claimed to it by the United States of America, taxes being paid instead by Ernest O. Buhler and Mildred B. Buhler.

Cord and Wheeler filed actions for damages against Santa Fe, alleging in substance, that pursuant to the Act of Congress on June 4, 1897 (30 Stat. 36), Santa Fe conveyed to the United States certain land to which it then had title and in exchange therefor Santa Fe received from the United States, rights to select lands owned by the United States; that Santa Fe sold certain of these selection rights to third persons; that Cord and Wheeler now own these rights; that in 1955, 1956 and 1957, at the request of Santa Fe, the lands which Santa Fe had conveyed to the government in exchange for the Forest Lieu Selection Rights which it had received and which claimants now own, were re-conveyed by the government to Santa Fe and, as a result, Cord's and Wheeler's selection rights were destroyed, all to their damage.

In answer to these charges, Santa Fe asserted in substance, that pursuant to the

provisions of the Transportation Act of 1940, supra, Santa Fe had, in 1941, executed and delivered to the United States a release of all claims it had against the government for reimbursement on account of lands granted to it or its predecessor in interest to aid in the construction of a railroad and that this release, among other things, terminated any and all outstanding selection rights including those allegedly owned by the claimants. Accordingly, Santa Fe alleged that the selection rights were destroyed in 1941 and that any claim against them for destruction of said rights had long since been barred by the statute of limitations.

The case was tried to the court in two parts. The first trial was limited to the question of liability. After the trial on the issue of liability, the court indicated by an order for partial judgment, that the claimants had a claim against Santa Fe. Thereafter, there was a trial on the issue of damages. Subsequently, the court indicated its conclusions as to the amount of damages.

In due course the court entered written findings of fact and conclusions of law and a formal judgment. In its conclusions of law, the court, inter alia, stated that Santa Fe had breached its implied warranty that it would do nothing to destroy the selection rights owned by the claimants, and that Santa Fe had breached its contract with the holders of the selection rights when it took back the base lands for those rights and thereby destroyed the right to select other federal land in exchange therefor.

The court awarded judgment in favor of Cord in the amount of $200,000 for the loss of his selection rights to 1,000 acres, and a judgment in favor of Wheeler in the amount of $59,472 for loss of his selection rights to 297.36 acres.

Santa Fe presents the following questions for review: (1) Whether the Forest Lieu Selection Rights claimed by Cord and Wheeler were terminated by virtue of the release executed and delivered by Santa Fe to the Secretary of the Interior and accepted by him on March 1, 1941, pursuant to the Transportation Act of 1940? (2) Whether the claimants are barred from asserting their claim by virtue of their delay and delay of their predecessors in interest in exercising the selection rights they claimed? (3) Whether the claimants have established they are the two owners of the powers they claim? (4) Whether the damages awarded claimants are supported by the evidence or whether they exceed the amount of damages supported by substantial, reasonable and competent evidence?

## THE FOREST LIEU SELECTION RIGHTS AND THE RELEASE OF 1941

Cord's and Wheeler's basis for their claims for relief is that Santa Fe destroyed their Forest Lieu Selection Rights in 1955, 1956 and 1957 when it asked for and received quit claim deeds from the United States to the base lands in exchange for those rights. Relying on the case of Krug v. Santa Fe Pacific Railroad Co., 329 U.S. 591, 67 S.Ct. 540, 91 L.Ed. 527 (1947), Santa Fe claims that the Transportation Act of 1940 and the release it executed in compliance therewith to the Secretary of the Interior terminated the Forest Lieu Selection Rights and that since the rights were destroyed in 1941, they were not in existence in 1955, 1956 and 1957 and are barred by the statute of limitations. We do not agree.

§ 321(b) of the Transportation Act of 1940, 54 Stat. 954, 49 U.S.C.A. § 65, provides that:

"If any carrier by railroad * * * or any predecessor in interest, shall have received a grant of lands from the United States to aid in the construction of any part of the railroad operated by it, the provisions of law with respect to [reduced rate] compensation for such transportation shall continue to apply to such transportation as though subsection (a) of this section had not been enacted until such carrier shall file with the Sec-

retary of the Interior, in the form and manner prescribed by him, a release of any claim it may have against the United States to lands, interests in lands, compensation, or reimbursement on account of lands or interests in lands which have been granted, claimed to have been granted, or which it is claimed should have been granted to such carrier or any such predecessor in interest under any grant to such carrier or such predecessor in interest as aforesaid. Such release must be filed within one year from September 18, 1940 [the date of the enactment of this Act]. Nothing in this section shall be construed as requiring any such carrier to reconvey to the United States lands which have been heretofore patented or certified to it, or to prevent the issuance of patents confirming the title to such lands as the Secretary of the Interior shall find have been heretofore sold by any such carrier to an innocent purchaser for value or as preventing the issuance of patents to lands listed or selected by such carrier, which listing or selection has heretofore been fully and finally approved by the Secretary of the Interior to the extent that the issuance of such patents may be authorized by law."

In the case of Krug v. Santa Fe Pacific Railroad Co., supra, the court pointed out that one substantial field of railroad-government controversy had been the terms of the original land-grant acts which required the railroads to carry government goods and personnel free of tolls. By reason of judicial interpretation of these terms, supplemented by periodic legislation, land-grant railroads for more than half a century immediately prior to 1940, transported for the government at one-half of the standard commercial rates.

During the depression years beginning in the late 1920's and immediately following, railroad earnings declined considerably, and a movement began to relieve the roads of their land-grant obligations. Studies by some government-selected agencies recommended legislation for the outright repeal of the provisions for rate concessions to the government. Bills to accomplish this during the 75th and 76th Congress failed to pass but § 321 of the Transportation Act of 1940 provided that land-grant roads could by compliance with specified conditions, collect from the government full commercial rates, except for the transportation of military and naval freight and personnel. Briefly, it required that a railroad, to qualify for full rates, must execute within a year after the passage of the Act, a release of any claim it might have " * * * against the United States to lands, interests in lands, compensation, or reimbursement on account of lands or interests in lands which have been granted, claimed to have been granted, or which it is claimed should have been granted to such carrier or any such predecessor in interest under any grant to such carrier or such predecessor in interest as aforesaid."

In addition to the Acts of Congress that we have previously mentioned, there should also be mentioned the Acts of 1874 and 1904, 18 Stat. 194; 33 Stat. 556. These Acts largely represent a congressional effort to settle conflicts among railroads, Government and settlers, which arose by reason of settlement by homesteaders on railroad-granted lands after the grants had been made. Both Acts provided that where settlers had so occupied railroad-granted lands, the railroad could, on relinquishment of its title to them, select other lands in lieu of them.

A reading of the case of Krug v. Santa Fe Pacific Railroad Co., supra, convinces us that Santa Fe's reliance on this case is misplaced. In the Krug case Santa Fe contended that it had so-called lieu land claims against the Government which it claimed were not extinguished by § 321 of the Transportation Act of 1940. These claims rested on contractual exchanges of land made by Santa Fe under the Acts of 1874 and 1904. 18 Stat. 194; 33 Stat. 556. In the Krug case Santa Fe had filed suit to require the Secretary of the Interior to pass upon its application for these lands allegedly due, but the district court dismissed

the complaint holding that § 321 of the Transportation Act of 1940 and the release that Santa Fe gave thereunder barred the claims. In ruling against Santa Fe the court held that the 1940 Act not only applied to claims for "lands under any grant" but held that: "It also required railroads to surrender claims for *compensation, or reimbursement* on account of lands or interests in lands which have been granted, claimed to have been granted, or which it is claimed should have been granted * * * under any grant.'"

In describing the language and purpose of the Act the court held:

"This language in itself indicates a purpose of its draftsmen to utilize every term which could possibly be conceived to give the required release a scope so broad that it would put an end to future controversies, administrative difficulties, and claims growing out of *land grants*. Beyond a doubt the words 'compensation' and 'reimbursement' as ordinarily understood would describe a payment to railroads in money or in kind for the surrender of lands previously acquired by them *under a grant.'* [citation] If they do not have this meaning, their use in the Act would have been hardly more than surplusage. And when viewed in the context of the historical controversies and claims under the land grants, the conclusion that the 1940 Act covers claims such as respondent's seems inescapable." (Emphasis added)

It is quite clear to us the *Krug* case stands for the proposition that the purpose of § 321 of the Transportation Act of 1940 and the release given thereunder was to settle once and for all any inchoate rights which the railroad might have had against the United States Government growing out of the land-grants. Santa Fe strays from the holding and meaning of the *Krug* case when it fails to properly define the terms "grant" or "land-grant." The term "grant" is not to be equated with "patent." Santa Fe's predecessor, the Atlantic and Pacific Railroad Company was given its grant of every alternate section of public land, not mineral, designated by odd numbers by the Act of July 27, 1866, 14 Stat. 292. The creation of the grant in 1866 was just one step towards the securing of a patent. Only when the line was in and a survey made would the location of the land "granted" be ascertained. The *Krug* case recognized that the Transportation Act of 1940 attempted to settle once and for all any and all unperfected rights the railroads might have had because of the grants. § 321 of the Transportation Act of 1940 has nothing whatsoever to do with lands such as the base lands in this case to which the railroads had already secured a patent. In fact, § 321(b) of the Transportation Act of 1940 specifically excepts patented lands from the operation of the release. Considering the purpose of the Act, it only makes common sense that any claims arising out of lands which had already been patented are also excepted from the meaning of the Act. As soon as the railroad receives its patent from the government, the land no longer is "grant-land" but it is land patented to the railroad and is owned by it as is the land of any other citizen in the country.

The claim which Cord and Wheeler had under the Act of June 4, 1897, 30 Stat. 36, is a claim separate and apart from any claims under the Transportation Act of 1940. The purpose of the Act of June 4, 1897, 30 Stat. 36, is well set forth in Udall v. Battle Mountain Company, 385 F.2d 90 (9th Cir. 1967). On June 4, 1897, Congress passed this Act providing that where lands in private ownership or lands subject to bona fide claim lay within the limits of a forest reservation, the settler or owner might relinquish the tract to the Government and select in lieu thereof a tract of vacant public land of equivalent area. We note that this Act pertained to railroads and private individuals alike, whereas the Transportation Act of 1940 was dealing only with railroads *as a railroad*.

To bolster its argument, Santa Fe has cited to us extracts from decisions of the General Land Office and extracts from the office of the Secretary of the Interior in-

volving the § 321(b) of the Transportation Act of 1940. Suffice it to say that none of these decisions concern Forest Lieu Selection Rights under the Act of June 4, 1897, 30 Stat. 36, and are therefore inapposite as is the case of Santa Fe Pacific Railroad v. Ickes, 57 F.Supp. 984 (D.C. 1944), also cited by Santa Fe. If the Forest Lieu Section Rights had been destroyed by the release given by Santa Fe pursuant to the Transportation Act of 1940, we find it difficult to believe that the United States Government would not plead the release in a claim by an owner of these rights against the Secretary of the Interior. We are referring in particular to the case of Udall v. Battle Mountain Company, supra. In that case Battle Mountain Company was the assignee of Forest Lieu Selection Rights. The case involved a direct action by the assignee against the United States. We first note in this case that the 9th Circuit Court of Appeals, although holding that the assignee did not have a direct cause of action against the Secretary of the Interior, did say in a footnote at page 94 of 385 F.2d:

"* * * Nothing we say here reflects on the right of Battle Mountain to sue Santa Fe on the powers of attorney it executed in 1915."[1]

## DELAY IN EXERCISING SELECTION RIGHTS

Santa Fe contends it was clear that time was of the essence under governmental regulations and the contracts with the Secretary of the Interior. It alleges that the railroad was obligated under the 1902 regulations to file selections "within a reasonable time" after the recording of the base land relinquishments. Introduced in evidence was a letter dated March 28, 1902 to the Secretary of the Interior by Santa Fe which stated in part:

"* * * we pledge ourselves to *immediately* begin the relinquishing of our private holdings within the limits of said reservation, and the selection of other lands in lieu thereof * * *. And we agree *to use all reasonable diligence* in prosecuting the work of relinquishment and selection to a final conclusion *at the earliest reasonable time.*" (Emphasis added.)

In the letter dated June 13, 1902 to the Secretary of the Interior, Santa Fe stated:

"It is further understood that the Department will, *in every reasonable way,* so *expedite* all necessary surveys and approval thereof, and the issuance of patents to the railroad company, *as to enable said company to promptly carry out this understanding.*" (Emphasis added.)

The railroad's proposals were approved by the Secretary of the Interior who wrote the following to the Commissioner of the General Land Office:

"The proposal of the railroad company in the two letters of Messrs. Britton and Gray [attorneys for the railroad] meets with my approval, and your office will *promptly* enter upon the work of *issuing patents* to the alternate odd-numbered sections named, where the railroad company is entitled thereto, *and otherwise take such steps* as may be necessary to effect the exchange named *in the manner prescribed in this correspondence and also in conformity to the statute and regulations.*" (Emphasis added.)

Thus, Santa Fe contends that since Cord and Wheeler stepped into its shoes, it appears to be self-evident that a period of fifty-odd years is more than the reasonable

---

1. In 1955, Congress passed the Recording Act of 1955, 69 Stat. 534, 43 U.S.C.A. § 274 Note. In 1955, concerned about the extent of floating scrip and dormant land claims and desirous of knowing the extent of the government's unfulfilled obligations respecting public lands, Congress passed an Act requiring recordation of all such claims, including claims to Forest Lieu Selection Rights. It was provided that if such claims were not recorded within a two year period, they would not be accepted as a basis for the acquisition of land.

time and diligence required by the regulations and by the contracts between the railroad and the United States for consummation of the exchanges. This being so, the holders of any powers of attorney have lost and forfeited their rights to enforce any selection rights. We do not agree.

On March 3, 1905, Congress repealed the 1897 Act so far as the related Forest Lieu Selection Rights, 33 Stat. 1264, but a saving clause preserved the rights of Santa Fe and others based upon their contracts with the Secretary of the Interior. No time for the exercise of the Forest Lieu Selection Rights was specified in the said 1905 enactment of Congress. The Act further provided that "But the validity of contracts entered into by the Secretary of the Interior prior to the passage of this Act shall not be impaired." In the case of John A. Eddy, decided April 8, 1919, 47 L.D. 109, by the Department of the Interior, it was held concerning Forest Lieu Selection Rights:

"The proviso to the Act of March 3, 1905, authorizing the making of a new Forest Lieu Selection, provides no specific period within which its benefits may be claimed, and any attempt to limit the rights of reselection to a certain time is an abridgment of the selector's rights and without authority of law."

The regulations implementing the 1905 Act are found in 33 L.D. 558; May 16, 1905 and state in part:

"* * * Congress referred to, recognized and authorized consummation of certain agreements entered into between the Secretary of the Interior and the owners of certain odd numbered sections of land in the San Francisco Mountains and the Grand Canyon forest reserves * * *. Under this provision selections are still authorized to be made in satisfaction of * * * odd numbered sections within the San Francisco Mountain forest reserve * * * [and] the Grand Canyon forest reserve, Arizona, relinquished or to be relinquished to the United States by the Santa Fe Pacific Railroad Company * * *. Upon the presentation of such relinquishments, with applications to select lands in lieu thereof, in accordance with instructions of July 7, 1902 (31 L.D. 372), you will accept same if otherwise unobjectionable."

The "Instructions of July 7, 1902 (31 L. D. 372)" in accordance with which relinquishments and selections under the contract's exceptions were thus required to be presented provides in ¶11:

"Selections should be filed *within a reasonable time* after the relinquishment or reconveyance has been recorded in the manner indicated." (Emphasis added.)

■■ In 1938 under the Federal Register Law (44 U.S.C.A. 311) the regulations of the Department of the Interior were codified. However, the regulations under the Acts of June 4, 1897 and June 6, 1900, approved July 7, 1902 (31 L.D. 372) and regulations under the Act of March 3, 1905, approved May 16, 1905 (33 L.D. 558), were not codified in 1938 and therefore have no force and effect today or anytime after 1938 insofar as affecting any of the rights of Cord and Wheeler. Santa Fe's argument is further militated against by the Recording Act of 1955, supra, which clearly shows that Congress still considered the Forest Lieu Selection Rights as being in full force and effect even though they had not been exercised.

Moreover, the outstanding rights were recognized by Congress by the Scrip Act of August 31, 1964. 78 Stat. 751, 43 U.S.C.A. 274. Under the 1964 Act, the parties who had registered their claims under the Recording Act of August 5, 1955, supra, could select lands of their own choosing without any value criteria until June of 1966.

## HAVE CLAIMANTS ESTABLISHED THEY ARE THE TRUE OWNERS OF THE POWERS THEY CLAIM?

■ Santa Fe claims that Cord and Wheeler have failed to prove they are the

true owners of the powers to select and powers to convey. Cord and Wheeler obtained the powers in 1951. In particular, Santa Fe asserts that "There is no evidence whatsoever of transfers from the original parties to whom the subject powers were issued. There is no evidence as to whether there were two or ten intervening transfers. There is no evidence as to whether any transfer between said intervening owners resulted from theft, transfer contrary to the provisions of any applicable probate code, etc."

The trial court in its conclusions of law number 4 stated:

" * * * That the Forest Lieu Selection Rights as sold by Santa Fe were assignable and transferable by the holders and owners of the powers of attorney to select and convey, by mere delivery thereof, without a formal written assignment or chain of title from the original purchasers thereof. Further, Santa Fe by selling the powers of attorney in the form which it did to the original purchasers is estopped to contend that the present holders and owners of the said powers of attorney must show or prove a complete chain of title from the original purchasers of the powers to the present holders and owners thereof."

Santa Fe cites to this court the case of Smith v. Rowe, 3 Wash.2d 320, 100 P.2d 401 (1940), as being a case on all fours with its position and the facts of this case. We do not agree. In Smith v. Rowe, supra, there was a purported assignment in blank by a corporation of its accounts receivable. The plaintiff in that case was the purported assignee who was attempting to enforce the assignment against a debtor. The court held that this was no proof that the original assignment had been made and that the possession of a chose in action does not raise a presumption of an assignment to such holder.

The case *sub judice* differs from Smith v. Rowe, supra, in that here the action is between the original "assignor" and an "assignee." There is no question in this case that Santa Fe executed powers to select and powers to convey in blank and for value. Indeed, the trial court found as a fact, that "The blank for the name of the attorney-in-fact in all powers of attorney was left blank, and it was the express purpose and intent of Santa Fe that the purchaser or any successor in interest of such purchaser to whom the power or powers of attorney might be sold, transferred or delivered should have the right to fill their name in the blank as the attorney-in-fact and thereafter to act as attorney-in-fact under said power to powers of attorney for Santa Fe, at anytime they should elect."

This finding of fact has not been disputed by Santa Fe. The form Santa Fe chose to sell these powers clearly indicates that it anticipated subsequent transfers by the original purchasers. After 50 years of such transfers and having chosen this particular form of transfer, Santa Fe is estopped from requiring the claimants to prove a chain of assignment. Cf. Holmes v. Graves, 83 Ariz. 174, 318 P.2d 354 (1957); City of Tucson v. Koerber, 82 Ariz. 347, 313 P.2d 411 (1957); Unruh v. Industrial Commission, 81 Ariz. 118, 301 P.2d 1029 (1956).

## ARE THE DAMAGES AWARDED CLAIMANTS SUPPORTED BY THE EVIDENCE?

Santa Fe claims that there was no competent evidence to support the findings by the court that the Forest Lieu Selection Rights claimed by Cord and Wheeler were worth $200 per acre. The evidence at the trial established that on June 16, 1956, Wheeler purchased 160 acres of Foest Lieu Selection Rights for $50 an acre. He later made subsequent purchases of Forest Lieu Selection Rights for $50 per acre, giving the person from whom he purchased the rights a right to repurchase for $75 per acre. Wheeler was questioned by his attorney as to his opinion of the value of the Forest Lieu Selection Rights. He testified that he thought that they were worth between $200 and $300 per acre. On voir dire examination by the

attorney for Santa Fe it was brought out that Wheeler's testimony was based upon what some other people had told him. This, however, does not destroy the admissibility of Wheeler's testimony. It is well established law that an owner of property is always competent to testify as to its value and that any explanation of how he arrived at that value merely goes to the weight of his evidence. Board of Regents of the University and State Colleges v. Cannon, 86 Ariz. 176, 342 P.2d 207 (1959).

As to the claim of Cord, the evidence shows that he paid in 1949 as much as $137 per acre for Forest Lieu Selection Rights. The court had the benefit of Wheeler's testimony as to his opinion of the value of his Forest Lieu Selection Rights. Although normally the opinion of one owner of property as to the value of his property does not prove the value of another person's property, we believe that this case presents an exception. Both Cord and Wheeler held exactly the same property. They both held the right to make a selection from government lands, acreage of the total amount of the base lands from which the lieu rights derived. These rights do not attach to any specific lieu lands prior to selection but rather give the holder the right to select from those lands which the government tells the owner may be available for selection. It would have been wholly unjust for the court in this case to have awarded Wheeler $200 an acre for his lieu rights and Cord $137 an acre or a lesser amount for his rights when they both held the identical property. For these reasons we do not believe the court erred in awarding both Cord and Wheeler damages based on $200 per acre.

We can also at this time dispose of the cross-appeal of Cord and Wheeler. They claim that under the Scrip Act of August 31, 1964 (43 U.S.C.A. 274) and regulations issued by the Secretary of the Interior pursuant to said Act, 43 C.F.R. 2221.01 to 2221.2–4, on or after July 1, 1966, holders of Forest Lieu Selection Rights recorded with the Secretary of the Interior by the year 1957 could have applied to the said Secretary and received the sum of $275 per acre in satisfaction of their claims. Cord and Wheeler therefore claim that the court should have awarded them damages in the sum of $275 per acre and not $200 per acre.

We do not agree with this contention. The value of the rights destroyed by Santa Fe must be valued as of the date the base lands were reconveyed to Santa Fe by the United States Government, to-wit, the years 1955 and 1956. As of that date, the Scrip Act of August 31, 1964 was not in existence, and the claimants are not entitled to recover based upon the acreage value set forth in that Act.

Cord and Wheeler also contend in their cross-appeal that they are entitled to punitive damages. Claimants contend that their cause of action is for conversion in tort. Santa Fe contends that it is a breach of contract action and that no punitive damages can be awarded for breach of contract.

Assuming arguendo that this is a tort action, our review of the evidence in this case does not indicate that punitive damages can be recovered unless the evidence clearly shows that the wrongdoer's action was wanton, malicious and oppressive or gross and outrageous. Iaegar v. Metcalf, 11 Ariz. 283, 94 P. 1094 (1908). Punitive damages are applicable where there is a reckless indifference to the interest of others. Nielson v. Flashberg, 101 Ariz. 335, 419 P.2d 514 (1966). The trial judge did not in his findings note such conduct on the part of Santa Fe. We do not disturb the findings of fact of the trial judge unless they are clearly erroneous, and will not disturb them in this case.

Affirmed.

KRUCKER, C. J., and HATHAWAY, J., concur.

NOTE: This cause was decided by the Judges of Division Two as authorized by A.R.S. § 12–120, subsec. E.